114 U.S. 401
 5 S.Ct. 888
 29 L.Ed. 149
 STATE NAT. BANK OF BOSTON
v.
UNITED STATES.
 April 13, 1885.
 
 The appellant brought this action in the court of claims to recover from the United States the sum of $125,000, with interest from March 1, 1867. The petition having been dismissed, the question upon this appeal is as to the liability of the United States to any judgment in behalf of the appellant. The facts found by the court of claims, and upon which the correctness of the judgment below must depend, are as follows:
 The appellant, in February and March, 1867, was a national banking association, having its place of business in the city of Boston, Massachusetts; and there was in that city a firm of brokers under the style of 'Mellen, Ward & Co.,' the junior member of which was Edward Carter. At the same time, George D. Whittle was the chief clerk in the office of the assistant treasurer of the United States, in Boston, having its general management, and Julius F. Hartwell was disbursing clerk or paying teller. Prior to the twenty-eight day of February, 1867, Mellen, Ward & Co., acting through Carter, succeeded in inducing Hartwell to take out of the sub-treasury, at various times, and to place in Carter's hands, large amounts of money belonging to the United States, until, first and last, the sum so abstracted aggregated a million to a million and a quarter dollars. This money was used by Mellen, Ward & Co. in stock speculations. About the middle of February, 1867, the amount so obtained by Carter being then very lare, Hartwell informed him that in the use of the public money the were guilty of a crime. This, it is found by the court below, was the first information Carter had of the criminal character of these transactions.
 Between the middle of February and the first of March, 1867, several conversations were held between Carter and Hartwell, in which in former expressed his purpose to make the latter's money right for the examination of the sub-treasury, which was expected to take place on the first of March, upon Hartwell's solemn assurance that he would let him have the money out of the sub-treasury again on the second of March, after the examination should be over, when Carter would repay the parties the moneys he had obtained, and, selling all the stocks and securities his firm held, replace as much as possible of the money in the sub-treasury, so as to reduce the loss to the smallest possible amount. Carter promised Hartwell that he would return all the money before the first of April, not again to come out of the sub-treasury. During the period within which those conversations between Carter and Hartwell occurred, the latter knew in a general way the extent of the resources of Mellen, Ward & Co., and how they were using the money he had let Carter have.
 On the twenty-eighth of February, Carter returned to Hartwell all the money the latter had let him have, except the sum of $157,000, which the former promised to return to him the next morning. Among the funds so returned were United States gold certificates to the amount of $580,000. On the afternoon of the same day, Hartwell made known to Whittle that he had been loaning to Carter the funds of the government, and that all had been returned except about $150,000. He told Whittle that the money had been paid out to Carter, from time to time, to assist in stock speculations; that it was paid back again to tide over the monthly examination; that he had promised Carter that the money should be repaid to him the following day; and had told him that he would ask Whittle's consent that the money go back to him again. Whittle told Hartwell that it was an impossibility to let the money go back to Carter, and that any deficiency must be paid in before 10 o'clock the next morning.
 About 9 o'clock A. M., of the first of March, Hartwell called on Carter at Mellen, Ward & Co.'s office and asked him if he had that money. Carter told him he did not then have it, but could give it to him before 10 o'clock, and asked Hartwell if he could not take a draft on New York, stating to him that Mellen, Ward & Co. would have a very large amount of New York funds to dispose of as soon as Hartwell returned to them the gold certificates aforesaid. Hartwell said he would take the New York funds, and the interview then ended. It does not appear that up to this time Carter had any knowledge or intimation of Hartwell's disclosures to Whittle; nor does it appear that Carter informed Hartwell as to how he intended or expected to get the draft on New York. At the close of this interview, Hartwell returned from Mellen, Ward & Co.'s office to the sub-treasury. About half past 9 o'clock of the same morning, Carter went to the banking house of plaintiff and obtained from Charles H. Smith, its cashier, his draft, as cashier, on the Manhattan Company, New York, in favor of Mellen, Ward & Co., for $125,000, which draft was in the words and figures following, to-wit: 'THE STATE NATIONAL BANK OF BOSTON,
 BOSTON, March 1, 1867.
 'Pay to the order of Mellen, Ward & Co., one hundred and twenty-five thousand dollars.
 'No. 215.
 C. H. SMITH, Cashier.
 'To the cashier of the Manhattan Company, New York.'
 The facts and circumstances connected with his obtaining that draft were as follows: Carter asked Smith for the bank's draft on New York for $125,000, promising to give him immediately, in return, Mellen, Ward & Co.'s draft on New York for the same amount, with $100,000 in United States gold certificates attached, or else the Adams Express Company's receipt for that amount in gold. Upon the faith of this promise, Smith drew and delivered to Carter the draft aforesaid. In this interview between Smith and Carter nothing was said by the latter about there being any deficiency in the sub-treasury for which he was responsible; nor that he desired to use the draft to help make good a deficiency there; nor what his purpose was in obtaining it; nor does it appear that Smith had, at any time before or during this interview, any knowledge or intimation of the transactions between Carter and Hartwell. Within 15 or 20 minutes after Carter received from Smith the draft for $125,000, the former, at the office of Mellen, Ward & Co., delivered it, together with $32,000 in currency, to Hartwell. The latter paid Carter nothing for the draft; it was passed to him by Carter to make good that deficiency; and Carter supposed it would not be wanted for that purpose over an hour. Neither before nor at the time Hartwell received from Carter the draft for $125,000 did the former know anything of the means by which the latter obtained it from Smith.
 Immediately after Hartwell received that draft and the $32,000 in currency from Carter, he took both to the sub-treasury and delivered them to Whittle, who objected to receiving the draft, because the rules of the government required the sub-treasury to receive nothing but gold, silver, legal-tender notes, or national bank notes; and, besides, he had an impression that, in some form or other, the plaintiff's cashier was involved in the stock speculation, which Hartwell had, the day before, told him of Mellen, Ward & Co.'s being engaged in; for Hartwell had then, after Whittle's refusal to let the money go out again, mentioned, among others, the name of Smith as one who was going to be hurt. Whittle then directed Hartwell to go out and collect the currency. Hartwell tried at several banks to raise the currency on the draft for $125,000, but could not find sufficient amount in any one bank. He then went to the Eagle National Bank of Boston, and obtained from it, in exchange for that draft, three of its drafts on New York, one for $75,000, and two for $25,000 each, with the idea that currency might be obtained in smaller amounts at different banks; but the hour was so late then—it being about 10 o'clock—that he took the three drafts directly to Whittle, at the sub-treasury saying to him that he had obtained them from the cashier of the Eagle national Bank, in exchange for the draft for $125,000, and that was the best he could do. The government examiners were at that time at work in the sub-treasury upon their monthly examination of the funds therein. Whittle then went out from the sub-treasury with the three drafts of the Eagle National Bank, and sold them to the Second National Bank of Boston, and returned to the sub-treasury with the proceeds of the sale, $125,000 in currency, which he turned over, along with the $32,000 aforesaid, to the examiners. These sums made up Hartwell's deficiency, and balanced the cash account of the office. No part of the $157,000 which those two sums made up, was ever returned to Hartwell, or Carter, or Mellen, Ward & Co., or the plaintiff. Neither when the draft for $125,000 was taken by Hartwell to Whittle, nor when it was exchanged by the former for the drafts of the Eagle National Bank, did Whittle have any knowledge or notice of the consideration or means by which that draft had been obtained from the cashier of the appellant; but he had an impression that Carter had procured it.
 About 15 or 20 minutes after Smith delivered the draft for $125,000 to Carter, as heretofore stated, Smith went to Mellen, Ward & Co.'s office to inquire the reason why Carter had not brought to him the gold certificates as he had agreed to do. Carter was then absent from the office, and his partner Mellen told Smith that Carter was out about the matter at that time, and, as soon as he brought the certificates, Mellen would take them to Smith. Immediately after this, Mellen, Ward & Co. sent to Smith thei draft on New York for $125,000, but did not send with it any gold certificates, nor a receipt of the Adams Express Company. After waiting, perhaps 15 minutes, Smith went again to know why the certificates or the receipt had not been brought to him, and then, for the first time, learned that Carter was at the sub-treasury, and in trouble.
 After all the foregoing transactions occurred, the plaintiff voluntarily paid to the Eagle National Bank the draft for $125,000 which Carter obtained from Smith; and the three drafts of that bank were duly paid on presentation in New York. The aforesaid draft of Mellen, Ward & Co. for $125,000 was never paid, nor was it presented to the drawee for payment. At the time Smith let Carter have the draft for $125,000, Smith was, as cashier, under bond to the plaintiff, with sureties, in the sum of $30,000, and after the plaintiff paid the draft it made demand upon him and his sureties; and the sureties, without being sued, paid to the plaintiff, within 90 days after the first of March, 1867, the full amount of their bond, and took a receipt therefor in terms such as the following:
 'State National Bank, Boston, reveived of _____ the amount due from them as sureties on the bond of Charles H. Smith, late cashier of said bank, by reason of the defalcation of said Smith, resulting from an unauthorized draft made by the said Smith upon the Manhattan Company, New York, for the sum of one hundred and twenty-five thousand dollars, ($125,000,) which was applied to his own use. If the said Smith shall hereafter pay to the State National Bank the said sum of one hundred and twenty-five thousand dollars, the bank will return to the sureties the amounts by them severally paid, or if he shall pay so much thereof that the bank shall be in the receipt, including the payments made by the sureties, of a surplus beyond one hundred and twenty-five thousand dollars, the bank will return and distribute such surplus to the sureties in proportion to the sums by them severally paid. But this receipt is not to be construed or understood as an admission or recognition of any obligation on the part of the bank to take any measures to make up said defalcation, nor as the assertion of any claim by the said bank upon any funds, property, or means whereby the said defalcation, or any part thereof, can be made good, nor as any admission by the said bank that any such funds, property, or means are in existence.'
 Geo. O. Shattuck, for appellant.
 [Argument of Counsel from pages 407-409 intentionally omitted]
 Sol. Gen. Phillips, for appellee.
 HARLAN, J.
 Mr. Justice HARLAN, after stating the facts in the foregoing language, delivered the opinion of the court:
 
 
 1
 The present case differs materially from U. S. v. State Bank, 96 U. s. 33. Our judgment there proceeded upon the ground that the gold certificates deposited in the sub-treasury by Smith, the cashier of the State National Bank of Boston, were known by Hartwell at the time he received them to be the property of that bank, and not of Mellen, Ward & Co. The deposit was made by Smith in the presence of Carter; and, although the receipt for the certificates was made out to Mellen, Ward &, Co. or order, it was immediately indorsed by Carter, in the name of his firm, to Smith, as cashier. The cancellation of the certificates, and their transmission to the treasurer of the United States at Washington, was, therefore, in derogation of the rights of the bank. It was adjudged that money or property of an innocent person, which had gotten into the coffers of the nation by means of fraud, to which its agent was a party, could not be held by the government against the claim of the wronged and injured party.
 
 
 2
 There is no room in the present case for the application of that principle. Apart from his responsibility for the crime committed in using the money of the United States, Carter, representing Mellen, Ward & Co., was under a legal obligation to replace the amount abstracted from the sub-treasury. Of his purpose to do so, Hartwell was informed. But he had no reason to believe that Carter would bring him money or securities which belonged to some one else, and which he could not rightfully deliver in discharge of his indebtedness to the government. When the draft of $125,000 was delivered by Carter to Hartwell, the latter was unaware of the means by which the former had obtained it from Smith, the cashier of appellant. It was, on its face, the property of Mellen, Ward & Co. Upon its receipt by Hartwell for the United States, the government acquired the same rights, in reference to it, that any private citizen, receiving it in the course of business, would have acquired. That the bank, by its cashier, made and delivered the draft to Carter upon the faith of his promise to give immediately, in return, Mellen, Ward & Co.'s draft on New York for the same amount, with $100,000 in United States gold certificates attached, or else the receipt of the Adams Express Company for that amount in gold, is a circumstance that does not affect the legal rights of the United States, to whom the draft was passed without knowledge, by its agent, of the condition upon which Mellen, Ward & Co. had received it from the bank's cashier. Nor do we deem of any significance the fact that Hartwell promised to return to Carter the money which the latter should place in the sub-treasury for the purpose of concealing from the officer supervising the examination of its books the criminal transactions in question. Carter knew that that promise could not be kept without subjecting both himself and Hartwell to criminal prosecution, and it was no violation of his legal rights for the agents of the government, after receiving from him the draft for $125,000, without any knowledge of the circumstances under which he had obtained it, to dispose of it, and place the proceeds in the sub-treasury. After these proceeds reached the sub-treasury, they could not be used or withdrawn except in the mode prescribed by law. The essential difference, therefore, between U. S. v. State Bank, ubi supra, and this case is that in the former the agents of the government appropriated to its use the property of an innocent person, knowing at the time that it belonged to that person, and not to the government, while in the present case they received, in the discharge of a debt due the government, a draft belonging to the debtor, without any knowledge or notice that the debtor had obtained it upon conditions which had not been complied with, or by means of fraudulent representations.
 
 
 3
 We perceive no ground to question the correctness of the judgment below, and it is affirmed.