# HOLLY *v.* MISSIONARY SOCIETY OF THE PROTESTANT EPISCOPAL CHURCH.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 138. Argued December 21, 1900.—Decided February 25, 1901.

This is a case in which a court of equity is called upon to decide upon which of two innocent parties is to fall a loss occasioned by the dishonesty of a third person. On the facts as stated by the court, it appears that the relation that existed between Thompson, the executor of Dr. Saul who left a legacy to the Missionary Society, and that society was that of executor and legatee; that the relation between Thompson and Holly, the purchaser of the estate sold by the executor, was that of attorney and client; and that as between themselves, Holly and the society were absolute strangers. The court, on the facts, holds that the pleadings and evi-

dence fail to show any such dereliction of duty or supine negligence on the part of the Missionary Society in demanding and enforcing payment of the Saul legacy as would show, or even tend to show, that the society knew, or had reason to believe, that Thompson was insolvent, or had been guilty of any misappropriation of the property or funds of the Saul estate; also that the evidence fairly showed that the Missionary Society had appropriated the money received by it to the purposes appointed by the testator, before any notice was given of the complainant's claim.

As against the Missionary Society Holly has no equities; and even if it could be said that the equities were equal, a court of equity will not transfer a loss that has already fallen upon one innocent party to another party equally innocent.

THIS was the case of a bill in equity filed in January, 1891, in the Circuit Court of the United States for the Southern District of New York, by James Holly, a citizen of the State of Pennsylvania, against the Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America, a corporation of the State of New York, and E. Walter Roberts, treasurer of the same.

The case came to issue on bill, answer and replication. Evidence was adduced by the respective parties, and certain exhibits and stipulations were filed.

The principal facts disclosed by the pleadings and evidence were these:

On December 23, 1887, the last will of Rev. James Saul, D. D., was duly proved and letters testamentary thereon granted by the register of wills in and for the city and county of Philadelphia to Rev. Benjamin Watson, D. D., and Henry C. Thompson, executors named in said will. In and by said will the testator bequeathed the whole of his estate to "the following institutions and in the following proportions, viz., to the Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America, three fourths of the whole of my said estate, conditioned that the amount thus bequeathed shall be appropriated by said society in equal proportions of one-third to domestic missions, one third to foreign missions and one-third to the benefit of the colored people in the Southern or formerly slave States for the support of schools and missions." The remaining one fourth of the whole of the

said estate he gave and bequeathed to the Theological Seminary near Alexandria, Virginia. By a codicil the bequest to the theological seminary was revoked, the testator having substituted therefor a donation of one hundred shares Pennsylvania Railroad stock, and which he had transferred to the trustees of the seminary; and by a later codicil, the testator further gave and devised to the Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America all the residue of his estate.

Neither the amount of the estate, nor the property of which it consisted, was mentioned in the will or codicils; but it appeared that, in addition to about $2493.03 cash, the testator was possessed of bonds of the North Pennsylvania Railroad Company and of the United Railroads of New Jersey, and in their account filed in the orphans' court of Philadelphia County the executors charged themselves with $17,268.03 as the amount of the estate. This account was confirmed on November 5, 1889, showing a balance in the hands of the executors of $14,927.54, which was awarded by the court to the Domestic and Foreign Missionary Society.

On June 19, 1890, the executor, Henry C. Thompson, called at the office of the defendant society in New York city, and handed to Roberts, the treasurer, a memorandum showing the above balance $14,927.54 awarded to the society by the decree of the orphans' court, from the Saul estate, and $650 dividends received since and not included in the account, making a total of $15,577.54. For this sum Thompson gave a check in the following words and figures:

"$15,577.54　　　　　　PHILADELPHIA, June 19, 1890.

"THE UNION TRUST COMPANY,

"Nos. 715, 717, 719 Chestnut Street.

"Pay to the order of the Domestic and Foreign Miss. Soc. of the P. E. Church fifteen thousand five hundred seventy-seven $\frac{54}{100}$ dollars.

"No. 623.　　　　　　　　H. C. THOMPSON."

Roberts, the treasurer, handed Thompson a receipt, as follows;

"NEW YORK, June 19, 1890.

"Received from executors estate of James Saul, late of Philadelphia, Pennsylvania, fifteen thousand five hundred seventy-seven $\frac{54}{100}$ dollars ($15,577.54).

"GEORGE BLISS, *Treasurer,*
"Per E. WALTER ROBERTS, *Assistant Treasurer.*"

Thompson's check was deposited by Roberts, treasurer, in the Bank of New York, for general account of the Foreign and Domestic Missionary Society of the Protestant Episcopal Church in the United States of America, by which bank the check was forwarded for collection to the Bank of North America of Philadelphia, and was to that bank paid, on June 21, 1890, by the Union Trust Company of Philadelphia.

The proceeds of this check were deposited in the general bank account of the Missionary Society, and were applied, with other moneys of the society, to domestic, foreign and colored missions, before the society was notified of the claim asserted in the bill of complaint.

In May, 1890, James Holly, a resident of Philadelphia, bought at auction for $12,000 a house and lot situated upon North Fifteenth street in that city. He took the title papers to H. C. Thompson, who had previously been employed by him, and requested Thompson to have proper conveyances made. As some of those interested in the sale resided elsewhere there was some delay in getting the papers signed. Finally, on June 19, 1890, Holly called on Thompson, who told him that the papers were ready, and asked for a check to meet the purchase money. Thereupon Holly gave him a check in the following form:

"PHILADELPHIA, June 19, 1890.

"The Fidelity Insurance, Trust & Safe Deposit Co., pay to Henry C. Thompson, attorney, or order, twelve thousand dollars.
"$12,000.                                        JAMES HOLLY."

And Thompson gave Holly a receipt, as follows:

"PHILADELPHIA, June 19, 1890.

"Received from James Holly, twelve thousand dollars, and J. A. Freeman's receipt for $200, to be applied to purchasing house, No. 643 North Fifteenth street.

"$12,000. (Signed) H. C. THOMPSON."

Holly never afterwards saw Thompson, but on July 15, 1890, was informed by Morgan, one of the vendors of the property purchased, that Thompson was lying at a hospital in Jersey City, where he had attempted suicide.

Taking alarm Holly consulted Mr. Burton, as an attorney, and it was discovered that Holly's check on the Fidelity Insurance, Trust & Safe Deposit Company in favor of Thompson for $12,000, dated June 19, 1890, had been by Thompson that day deposited in the Union Trust Company, Philadelphia, and that, by a check of June 19, 1890, in favor of the Domestic and Foreign Missionary Society of the P. E. Church in the United States of America, Thompson had drawn out $15,577.54, leaving a balance in his favor of $72.41.

According to the finding of the Circuit Court this check in favor of the Domestic and Foreign Missionary Society was, to the extent of $10,028, paid by the Union Trust Company out of the moneys realized from Holly's check to Thompson; and that court decreed against the Missionary Society in favor of the complainant for that amount. 85 Fed. Rep. 249.

Upon appeal the decree of the Circuit Court was reversed by the Circuit Court of Appeals for the Second Circuit, and the bill directed to be dismissed, (92 Fed. Rep. 745,) and thereupon the case was brought to this court by a writ of certiorari.

*Mr. John G. Johnson* for Holly. *Mr. Matthew Verner Simpson* and *Mr. Cephas Brainerd* were on his brief.

*Mr. Julien T. Davies* for the Missionary Society. *Mr. Herbert Barry* was on his brief.

MR. JUSTICE SHIRAS, after making the above statement, delivered the opinion of the court.

This is a case in which a court of equity is called upon to de-

·cide upon which of two innocent parties is to fall a loss caused by the dishonesty of a third person. The relation that existed between Thompson and the Missionary Society was that of executor and legatee; between Thompson and Holly, that of attorney and client. As between themselves, Holly and the Missionary Society were absolute strangers.

Our examination of the pleadings and evidence fails to show any such dereliction of duty or supine negligence on the part of the Missionary Society in demanding and enforcing payment of the Saul legacy as would show, or even tend to show, that the society knew, or had reason to believe, that Thompson was insolvent, or had been guilty of any misappropriation of the property or funds of the Saul estate. It is true that the legacy was not paid as promptly as the society had reason to expect, but there was nothing unusual about such a delay.

The very fact that Rev. Dr. Saul had selected Thompson to be one of his executors authenticated him to the society as a trustworthy person, and while it is true that Rev. Mr. Watson, who was a co-executor, in letters answering inquiries by the secretary of the society in April and May, 1890, admitted that Thompson was dilatory in settling the estate, there was nothing to justify suspicion on the part of either Mr. Watson or of the society that there was anything wrong in Thompson's dealings with the estate. Accordingly we are fully satisfied that, when Thompson called upon the society at the New York office, on June 19, 1890, and paid the amount shown to be due the society by the account of the executors in the orphans' court of Philadelphia County, approved November 23, 1889, together with the additional sum of $650 received after and not included in the account, there was nothing, either in the previous transactions, or in the form of the payment by Thompson's check, to put the society upon notice, or to have justified the treasurer in refusing to accept the payment. When Thompson's check was paid the following day and the proceeds had gone into the bank account of the Missionary Society, the matter was fully closed between the executors of Saul's estate and the society.

Beyond this, we think the evidence fairly shows that the Missionary Society had appropriated and expended the money so

received, to the purposes appointed by the testator, before any notice was given of the complainant's claim. While such use and application of the money might not exonerate the society from liability, if they had received the money in circumstances that visited them with notice of Thompson's dishonest conduct towards Holly, yet if the money, received in good faith by the legatee, had actually and *bona fide* been applied and expended for the use of the beneficial purposes appointed in the will, without knowledge of Holly's claim, or, indeed, that such a man existed, we think a court of equity would refuse to hold the society as a trustee *ex maleficio.*

The learned Judge of the Circuit Court, speaking of this aspect of the case, does indeed say:

" Some suggestion is made that this was received as a charitable bequest, and so applied that it had gone beyond reach, and cannot be recovered. But the defendant has not shown that this particular money has been applied to any particular purpose as coming from Saul, or otherwise than as it would use its general funds in the furtherance of its objects, nor that any of this particular money was applied to any of its purposes."

If this statement is to be understood to mean that the money, bank notes or specie, actually received on Thompson's check, was not immediately and in form applied to the beneficial purposes named in Saul's will, it may be true; indeed, it appears that the proceeds of Thompson's check were paid into the Bank of New York for general account of the Missionary Society, and that thus the identity of the bank notes or specie was lost in the credit account of the society in that bank. But it is not perceived that such a state of facts disabled the society from having the advantage of showing that money to an equal amount was appropriated and applied by them, out of their general account, to the purposes appointed by the testator. To demand that such a society should make special deposits of legacies received, so as to be able to trace the application of such deposits into the hands of beneficiaries in the same form as when received, would be, in the highest degree, unreasonable.

If, however, the meaning of the learned judge was that it did not distinctly appear that the Missionary Society had ap-

propriated and applied an amount of money equal to that received from the Saul estate to the purposes appointed in the will, before any notice was received of Holly's claim, we are constrained to decidedly dissent from such a view.

In the bill of complaint the defendants were explicitly called upon to answer under oath whether, and in what circumstances, they had received money from Thompson, and particularly whether such money had been received as coming from the estate of James Saul, deceased, and whether they had not received a letter from plaintiff's attorney, on or about July 17, 1890, notifying them that the moneys so received by the defendants through Thompson's check came from moneys belonging to Holly. To these allegations and interrogatories the defendants answered, denying any knowledge or belief on their part of the transactions between Thompson and Holly "until long after the receipt by defendants and expenditure of the $15,577.54 referred to; and these defendants, further answering, allege that at the time of the notification hereinbefore referred to and the receipt by the defendant society of the letter from plaintiff's attorney, these defendants had expended, in the usual course of their business and according to the will of the said Rev. James Saul, the said sum of $15,577.54."

To this portion of the answer the plaintiff filed exceptions for insufficiency, as follows:

"In not stating how the defendants have expended the $15,577.54, what the items of expenditure were and the respective dates of such items of expenditure, and how and in what respect the said moneys were expended according to the will of the Rev. James Saul, deceased, and what was the usual course of business of defendant's society in making said expenditure of said moneys, whether the same was expended by standing order or special resolution of the board of managers of the society defendant, or otherwise."

Thereupon the defendants, responding to these exceptions, filed a supplemental answer, as follows:

"These defendants, further answering, allege that the moneys received as aforesaid from Henry C. Thompson, executor, were expended by the defendant society for domestic missions,

foreign missions and for the benefit of colored people in the Southern, or formerly slave, States, for the support of schools and missions, through its officers, acting partly under the general direction of the board of managers and partly under a resolution of said board passed on the tenth day of June, 1890, authorizing the treasurer to apply such legacies as might be received before September 1, 1890, to the payment of appropriations to September 1, 1890—of which resolution a copy is hereto annexed and marked 'P.'"

The copy of the resolution was as follows:

"Resolved, that the treasurer be instructed to apply so much of the gross amount received from domestic and general legacies to September 1, 1890, as may be required toward the appropriations for corresponding work to same date."

It was also made to appear that, on June 20, 1890, the balance in bank to the credit of the Missionary Society was $43,569.83. On that day the balance was increased by the proceeds of Thompson's check $15,577.54 and other money to $60,110.09; and that, by checks drawn between June 20 and July 18, the day on which the letter of Holly's attorney was received, the sum of $88,589.74 was drawn out; aggregating more than the sum of Thompson's check and the balance on hand when it was received, and it was shown that these payments were on account of domestic, foreign and colored missions and office expenses.

It is true that, owing to further receipts between June 20 and July 18, 1890, there was a balance on hand in bank on the latter day, but those receipts were themselves trust funds, contributed and held for the charitable purposes of the society. It need scarcely be said that a court of equity will not interfere with the proper application of such funds by constraining the society to divert them to relieve Holly. This, of course, was not the case of a running account between debtor and creditor, where the general rule is that the debtor has a right, if he pleases, to make the appropriation of payments; if he omits it, the creditor may make it; if both omit it, the law will apply the payments according to its own notions of justice. Here there was no relation of debtor and creditor between the

Missionary Society and Holly, and the latter cannot be heard to complain of the application by the society of the money received from Thompson, executor, to the purposes prescribed by the testator, nor to demand that moneys subsequently received by the society from third persons for specific charitable purposes shall be used to indemnify him from loss occasioned by trusting his money with his attorney.

From the numerous cases cited we think it sufficient to refer to two or three which resemble in their facts the case in hand, and in which were laid down principles now applicable.

*Stephens* v. *Board of Education*, 79 N. Y. 183, was a case where one Gill, who was a member of the board of education of the city of Brooklyn, had converted to his own use the money of the board, and so became indebted to it in the amount thus subtracted. Gill forged a mortgage upon the land of another and sold it to Stephens, receiving from him the proceeds and depositing them to his own credit. He then drew a check for the amount of his debt to the board of education, and with it paid that debt in full. The court held that Stephens could not recover the money from the board, saying:

" It is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payer. Money has no earmarks. The purchaser of a chattel or a chose in action may by inquiry in most cases ascertain the right of the persons from whom he takes the title; but it is generally impracticable to trace the source from which the possessor of money has derived it. It would introduce great confusion into commercial dealings if the creditor who receives money in payment of a debt is subject to the risk of accounting therefor to a third person who may be able to show that the debtor obtained it from him by felony or fraud. The law wisely, from considerations of public policy and convenience and to give security and certainty to business transactions, adjudges that the possession of money vests a title in the holder as to third persons dealing with him and receiving it in due course of business and in good faith upon a valid consideration. If the consideration is good as between the parties, it is good as to all the world. ' Money;' said Lord Mans-

field in *Miller* v. *Race*, 4 Burr. 452, 'shall never be followed into the hands of a person who *bona fide* took it in the course of currency and in the way of his business.' "

In *Hatch* v. *National Bank*, 147 N. Y. 184, the agent of Hatch procured a loan upon stock which he had fraudulently converted. He then with the money thus procured paid an antecedent debt which he owed to the bank. The court said:

" This doctrine goes upon the ground that money has no earmarks, that in general it cannot be identified as chattels may be, and that to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money and a recovery if shown to have been dishonestly acquired, would disorganize all business operations, and entail an amount of risk and uncertainty which no enterprise could bear. The rule is founded upon a sound general policy as well as upon that principle of justice which determines, as between innocent parties, upon whom the loss should fall under the existing circumstances."

In *State Bank* v. *United States*, 114 U. S. 401, it was held that where, by the connivance of a clerk in the office of an assistant treasurer of the United States, a person unlawfully obtains from that office money belonging to the United States, and to replace it pays to the clerk money which he obtains by fraud from a bank, the clerk having no knowledge of the means by which the latter money was obtained, the United States are not liable to refund the money to the bank.

The case made out for the appellant Holly does not require extended notice.

Let it be conceded that he was not, in the circumstances, estopped from following his money into the hands of the Missionary Society, by having entered an attachment against Thompson for a fraudulent conversion of his money; let it also be conceded that, by trusting his money with Thompson, who had theretofore been his attorney, and whose standing in the community was good, he was not guilty of conduct so reckless and negligent as to, of itself, deprive him of a remedy; yet his case fails in the essential particular that he has not shown that the Missionary Society, in receiving from Thompson, executor, the

money due from the estate of Rev. Dr. Saul, and in applying it in accordance with the appointments in the will, acted with any notice or knowledge, actual or imputable, that Thompson was misapplying funds intrusted to him by a third person with whom the society had no relations whatever. As against the Missionary Society, Holly, in the circumstances disclosed, has no equities; and even if it could be said that the equities were equal, a court of equity will not transfer a loss that has already fallen upon one innocent party to another party equally innocent.

The decree of the Circuit Court of Appeals of the Second Circuit is

*Affirmed.*

Mr. Justice Brewer did not hear the argument, or take part in the decision.