**COMMERCIAL NAT. BANK OF INDE-PENDENCE, KAN., v. STOCKYARDS LOAN CO.**

**STOCKYARDS LOAN CO. v. COMMERCIAL NAT. BANK OF INDEPENDENCE, KAN.**

(Circuit Court of Appeals, Eighth Circuit. December 31, 1926.)

Nos. 7244, 7245.

**1. Appeal and error ⬩1022(3)—Master's findings, approved by trial court, are not disturbed, when not clearly against weight of evidence.**

Findings of master, approved and confirmed by trial court, are presumptively correct, and will not be disturbed, unless clearly against the weight of the evidence.

**2. Trusts ⬩358(2)—One mingling own and trust's funds in personal bank deposit is presumed to have first drawn out own funds on check for personal debt.**

Agent or trustee, depositing trust funds to his own personal credit and mingling them with his personal funds, and thereafter drawing checks on the deposit in payment of his personal debts, will be presumed to have first drawn out his own money, leaving that belonging to the trust fund.

**3. Trusts ⬩102(1)—Mortgagor, in selling mortgaged cattle and depositing proceeds in his personal account, occupied fiduciary relation to mortgagee.**

In selling mortgaged cattle and depositing the proceeds in his individual account, mortgagor must be held to have acted as agent or trustee for mortgagee, thus occupying a fiduciary relation to it as respects the money.

**4. Banks and banking ⬩130(3)—In view of mutual indulgence of balances, bank without notice of beneficial ownership held not liable to one whose funds agent deposited in own name and used to pay agent's pre-existing debt to bank.**

There being a mutual indulgence of balances between bank and depositor, in which his deposits in his own name of proceeds of cattle which he had mortgaged played no inconsiderable part—that is, it having extended credit to him by reason of said deposits along with others, and changed its position by reason thereof—it, having had no notice of the beneficial ownership thereof, is not liable to the mortgagee for such funds used by the depositor to pay his pre-existing debt to it.

**5. Equity ⬩409—Ultimate facts, which must be drawn from primary facts found by master, will be treated as found.**

Though master specifically found only primary facts, ultimate facts, which can and must be drawn therefrom, will be treated as found.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit by the Stockyards Loan Company against the Commercial National Bank of Independence, Kan. From the decree, both parties appeal. Reversed, with instructions.

R. B. Caldwell and David A. Murphy, both of Kansas City, Mo. (H. L. McCune, of Kansas City, Mo., on the brief), for plaintiff.

Charles W. German, of Kansas City, Mo. (Lee C. Hull and Charles Z. German, both of Kansas City, Mo., on the brief), for defendant.

Before BOOTH, Circuit Judge, and PHILLIPS and JOHN B. SANBORN, District Judges.

BOOTH, Circuit Judge. This was a suit by the Stockyards Loan Company (hereafter called the loan company), a citizen of Missouri, against the Commercial National Bank of Independence, Kan. (hereafter called the bank), a citizen of Kansas, for an accounting of alleged proceeds from the sale of cattle owned and sold by Albert Gottlieb, but upon which the loan company claimed to hold chattel mortgages. Gottlieb, for many years prior to the commencement of the present suit, was engaged in the cattle business. His residence was Bartlesville, Okl. The loan company's place of business was in Kansas City, Mo.

The cause was referred to a special master, who made voluminous findings, among them the following:

"For some 20 years prior to 1918 * * * Gottlieb * * * had been a customer of the defendant bank. * * * He owned a large body of land and also held leases on large pas-

tures in * * * Oklahoma. He * * * raised horses, cattle, sheep, and hogs, and he bought cattle in different parts of Oklahoma, Kansas, Texas, and New Mexico. When he bought cattle, he would take them to one or more of his pastures above mentioned, would brand them, and would prepare them for the market. For 10 or 12 years prior to 1918 he had been buying large numbers of cattle in Texas and Oklahoma, shipping them to his various pastures, and, after branding them, would pasture and feed them until he deemed they were ready to be marketed.

"During all this time, and during the time involved in this controversy, the said Gottlieb kept in the defendant bank an open deposit and checking account, depositing therein money derived from different sources and checking thereon for the purchase of cattle and various purposes. He very frequently, when buying cattle, would draw a check or draft upon the defendant bank without having sufficient means therein to meet such check or overdraft. In such cases, he usually gave the bank an unsecured note to cover the overdraft, and in this way he was very often indebted to the bank in large sums of money. When his indebtedness to the bank equaled the amount which, by law, the bank was authorized to loan him, he frequently borrowed money of [the president of the bank] individually. These notes were sometimes time notes and sometimes demand notes. Upon the purchase of cattle, and after he had taken the cattle to some pasture and branded them, he would go to Kansas City, Mo., and borrow of plaintiff large sums of money, evidenced by notes secured by chattel mortgages upon the cattle, and usually out of such loan he would pay defendant bank the amounts borrowed of it for the purchase of the cattle. The fact that Gottlieb kept a checking account with the defendant bank was well known to plaintiff, and the fact that he was borrowing of plaintiff money upon chattel mortgages on purchased cattle was well known to the defendant bank. In fact, in many instances, the money of plaintiff [borrowed] by Gottlieb was remitted directly to defendant by plaintiff. In some instances he would draw drafts upon the plaintiff, payable to defendant bank, to pay the money originally borrowed, and in some instances the plaintiff deposited the proceeds of mortgage loans to Gottlieb in a Kansas City bank to the credit of the defendant bank.

"Each and every mortgage given by Gottlieb to plaintiff contained the following stipulation and agreement: 'Until the default herein, or until possession has been taken by the second party as aforesaid, or the representative or the assigns of the second party as aforesaid, the first party may retain possession of said property. When marketed, the written consent of the second party having been first obtained, said property shall be consigned to the Stockyards Loan Company, Kansas City, Mo., and the proceeds applied to the payment of the above-mentioned indebtedness, and the surplus, if any, being paid to the first party. The first party shall not sell or attempt to sell, except in conformity herewith, or remove or attempt to remove, from its present location in the county aforesaid, all or any part of said property.' "

The mortgages were "duly recorded under the laws of Oklahoma." The transactions particularly involved in the present suit took place in the period from July 5, 1918, to January 20, 1920. The master further found:

"During all of said times, and for some years prior thereto, plaintiff never required Gottlieb to obtain its written consent to the sale of mortgaged steers, nor required him to consign the mortgaged steers to it, but, on the contrary, allowed and permitted him to sell when, where, and to whom, and for what prices, he chose.

"At no time were any of the mortgaged cattle, consigned to and sold by the commission companies, consigned in the name of plaintiff, but in each and every instance they were consigned either in the name of Gottlieb, or of Gottlieb and one Darnell (whose interest in the cattle is not material here), and were sold on account of Gottlieb, who directed the disposition of the proceeds of the sale. The plaintiff never, in any way, advised any of the commission companies what cattle were mortgaged to it, or what proceeds of cattle sold should be forwarded to it, but in each and every instance, allowed and permitted Gottlieb to advise it what mortgaged cattle he had sold and the proceeds of such sale, and from the statement of Gottlieb, sometimes accompanied by a copy of the account sale, would credit Gottlieb upon that mortgage which Gottlieb said covered the cattle sold. In other words, the plaintiff relied implicitly upon the honesty and fidelity of Gottlieb in making the sales and paying it the proceeds of the sales of cattle, upon which it held a mortgage. * * * In this manner it received by direction of Gottlieb, from the commission companies of Kansas City and St. Louis, the proceeds of something like 1,745 cattle, aggregating more than $163,000."

The master further found that during said period Gottlieb had sold cattle which were mortgaged to the loan company and caused the proceeds to be deposited in the defendant bank to his credit, in the aggregate sum of $65,160.32; that of such amount $40,504.62

was paid by Gottlieb by check on the defendant bank to the bank itself, and was applied upon pre-existing indebtedness owing by Gottlieb to the bank. The master further found:

"During all of the time that Gottlieb was thus selling steers mortgaged to plaintiff and causing the proceeds of such sales to be transmitted to the defendant, the plaintiff, by and through its officers, knew that Gottlieb was selling live stock upon the markets of Kansas City, Mo., and East St. Louis, Ill., and causing the proceeds to be transferred to defendant bank for his credit; but it did not know that Gottlieb was selling cattle mortgaged to it and causing the proceeds of such cattle to be transmitted to the defendant bank.

"During all of the time that Gottlieb was thus selling steers mortgaged to plaintiff, and causing the proceeds of such sales to be transmitted to the defendant, he was depositing in his account with the bank money from other sources, and drawing upon said account checks for various purposes, including the purchase of cattle and the payment to the bank of notes evidencing his indebtedness to the bank.

"During all of the time the defendant bank was receiving from commission companies and banks in Kansas City, Mo., and East St. Louis, Ill., remittances to be placed to the credit of Gottlieb, it, by and through its officers, knew that such remittances were the proceeds of live stock sold by Gottlieb in the markets of those cities.

"All of the money deposited or caused to be deposited by Gottlieb in defendant bank, including the money arising from the sales of mortgaged cattle to plaintiff, was by the defendant bank credited to the account of Albert Gottlieb, and was paid out by it upon the checks and orders of said Gottlieb, duly presented to it for payment in the usual and ordinary course of business.

"The evidence fails to establish that the defendant had any actual notice or knowledge that the money being remitted to it for the credit of Albert Gottlieb, as hereinbefore found, was the proceeds of cattle mortgaged to the plaintiff, and I find that it had no such actual notice or knowledge, and notice or knowledge of no fact sufficient to be held constructive notice or knowledge, of the fact that Gottlieb was selling cattle mortgaged to the plaintiff and causing the proceeds to be remitted to the defendant bank."

The master recommended judgment in favor of the bank. The loan company filed numerous exceptions to the master's report. The trial court, after a careful consideration and review of the master's report, disposed of

16 F.(2d)—58

the exceptions in an opinion which concludes as follows:

"I overrule the exceptions taken to the report of the master in all save this: To his finding there is no sum of money found due from defendant to complainant, and declare as a matter of law, equity, and good conscience the sums of money derived from the proceeds of cattle mortgaged to complainant and employed by the bank to pay the indebtedness of Gottlieb to it, as stated in the findings of fact made by the master, to be, under all the facts and circumstances of this case, the property of complainant, and that the complainant has therein a superior right to defendant bank."

Decree was entered awarding plaintiff the sum of $40,504.62 with interest, amounting in all to $55,039.37. Both parties have appealed.

The Appeal of the Plaintiff Loan Company.

This appeal raises the question whether the trial court erred in not awarding the loan company the full amount which the master found the bank received from the proceeds of the cattle mortgaged to the loan company. Plaintiff contends that the bank had actual knowledge or constructive notice that the moneys which it received from time to time from Gottlieb or by his direction were the proceeds of cattle mortgaged to the loan company. The burden was upon plaintiff to prove this contention. The master has found adversely to the contention, and the trial court has approved the finding. The evidence is of a conflicting character, but there is substantial evidence in support of the master's finding.

[1] The findings of a master, approved and confirmed by the trial court, are not to be lightly set aside. While they do not have the conclusive character of a verdict of a jury or the findings of a judge—when in a law action a jury has been waived by a written stipulation of the parties, on file—yet they are presumptively correct and should not be disturbed, unless clearly against the weight of the evidence. Tilghman v. Proctor, 125 U. S. 136, 149, 8 S. Ct. 894, 31 L. Ed. 664; Callaghan v. Myers, 128 U. S. 617, 666, 9 S. Ct. 177, 32 L. Ed. 547; Kimberly v. Arms, 129 U. S. 512, 525, 9 S. Ct. 355, 32 L. Ed. 764; Camden v. Stuart, 144 U. S. 104, 118, 12 S. Ct. 585, 36 L. Ed. 363; Crawford v. Neal, 144 U. S. 585, 596, 12 S. Ct. 759, 36 L. Ed. 552; Furrer v. Ferris, 145 U. S. 132, 12 S. Ct. 821, 36 L. Ed. 649; Girard Ins. Co. v. Cooper, 162 U. S. 529, 538, 16 S. Ct. 879, 40 L. Ed. 1062; Road Imp. Dist. No. 4 v. Wilkerson, 5 F.(2d) 416 (C. C. A. 8); Dickinson v. O. & W. Thum Co. (C. C.

A.) 8 F.(2d) 570; Smith v. Hovland, 11 F. (2d) 9. See, also, Houchin Sales Co. v. Angert, 11 F.(2d) 115, 117 (C. C. A. 8).

After a careful consideration of the evidence, we are not inclined to disturb the findings of the master, which were approved by the trial court. The decree must therefore stand as against the appeal of the plaintiff.

### The Appeal of the Defendant Bank.

In considering this appeal we shall proceed on the assumption that the bank received proceeds from the sale of cattle which were mortgaged to the loan company. The master has so found; the trial court has approved the finding; there is substantial evidence in its favor; the finding will, therefore, not be disturbed. See citations, supra. We shall also assume that the payments made by Gottlieb to the bank by his several checks were in some amount, at least, from moneys derived from the sale of the mortgaged cattle, though to what extent this was the case is somewhat doubtful in view of the master's findings.

The principal question raised by defendant's appeal is this: Conceding that the bank had no actual or constructive knowledge or notice that among the moneys which it received from Gottlieb were proceeds of the sale of cattle which were mortgaged to plaintiff, was the bank nevertheless liable to plaintiff for the amount of such proceeds which Gottlieb transferred to the bank in payment of his preexisting debt to the bank? The plaintiff loan company contends that this question should be answered in the affirmative; the defendant bank, in the negative.

In order to answer this question properly, it is necessary to consider, not only the facts already stated, found by the master, but also certain other facts relating to the accounts between Gottlieb and the bank, which were found by the master or which appear from the uncontradicted evidence. Deposits were made by Gottlieb in the bank of moneys derived from the sale of the mortgaged cattle as follows:

| | |
|---|---|
| From July 5 to August 13, 1918.... | $23,113.68 |
| From August 13, 1918, to September 24, 1919 | 21,376.54 |
| From September 24 to October 9, 1919 | 16,899.27 |
| From October 10 to October 25, 1919 | 2,743.39 |
| From October 25, 1919, to January 20, 1920 | 1,024.84 |

Payments were made by Gottlieb to the bank from the proceeds derived from the sale of the mortgaged cattle as follows:

| | |
|---|---|
| August 13, 1918 | $16,923.23 |
| September 24, 1919 | 10,352.00 |
| October 10, 1919 | 10,486.00 |
| October 25, 1919 | 2,743.39 |

On August 13, 1918, Gottlieb had on deposit with the bank $40,096.52, of which $23,113.68 had come from the sale of mortgaged cattle, leaving $16,982.84 derived from other sources. On that date Gottlieb paid the bank $16,923.23, leaving $59.61 over and above the trust fund, $23,113.68, which had been derived from the sales of the mortgaged cattle.

[2] The presumption is that Gottlieb paid out his own funds and kept the trust funds intact. This is in accordance with the doctrine that, where an agent or trustee deposits trust funds to his own personal credit, and mingles them with his personal funds, and thereafter draws checks on the deposit in payment of his personal debts, he will be presumed to have drawn out his own money and to have left that belonging to the trust fund. 7 C. J. 646; Merchants' Nat. Bank v. School District No. 8 (C. C. A.) 94 F. 705; Bank of British N. A. v. Freights, etc. (C. C. A.) 137 F. 534, 538; Board of Com'rs v. Strawn (C. C. A.) 157 F. 49, 15 L. R. A. (N. S.) 1100; Brennan v. Tillinghast (C. C. A.) 201 F. 609; Drovers', etc., Bank v. Roller, 85 Md. 495, 37 A. 30, 36 L. R. A. 767, 60 Am. St. Rep. 344.

After making the payment of $16,923.23 on August 13, 1918, Gottlieb owed the bank nothing. His new loans from the bank from this date on to January, 1920, ran at times as high as $50,000. No security was required by the bank on these loans. During this period his deposits of moneys derived from sales of cattle, including those mortgaged to plaintiff, aggregated more than $170,000. There were other large deposits from different sources. His daily balance sometimes ran as high as $40,000. On the other hand, overdrafts were not of infrequent occurrence. They ran from a few dollars to upwards of $11,000. Between August 13, 1918, and the date of the next credit item, checks were drawn amounting to more than $15,000. By December 7, 1918, all of the balance had been checked out, and there was an overdraft of $1,927. The trust fund had completely disappeared.

We may assume that the balance in the bank, amounting to $12,319.05 on September 24, 1919, the date of the next payment, was wholly trust funds. Gottlieb had deposited between August 13, 1918, and September 24, 1919, $21,376.54 out of proceeds of cattle mortgaged to plaintiff. He had therefore checked out from these trust funds the difference, amounting to $9,057.49. On September 24, 1919, he made a payment to the bank of $10,352, and he then had a balance of $1,967.05. By October 1, 1919, this balance was checked down to $793.50. By October 9, 1919, he had deposited $16,899.27, proceeds of

cattle mortgaged to plaintiff, and his balance of that date was $17,565.63. From this he paid the bank $10,486. He continued to check against the balance until on October 15, 1919, he had a balance remaining of only $453.82.

The balance was again built up until, on October 24, 1919, it amounted to $37,638; but included in this balance was only $2,743.39 derived from sale of cattle mortgaged to plaintiff. Payment was made to the bank on October 25, 1919, of $13,500, leaving a balance of $24,138. By November 18, 1919, this balance, as well as upwards of $22,000 intervening deposits, were all checked out, and there were overdrafts amounting to $11,475.

[3] In making the sales of the mortgaged cattle, and in making the deposits of the proceeds, Gottlieb must be held to have acted as agent or trustee for the loan company. He occupied a fiduciary relation to that company, so far as the transactions in question were concerned.

[4] We turn to the inquiry: What are the principles of law applicable to the foregoing facts? The authorities are far from harmonious upon the question when and how far a bank is liable to a beneficial owner of moneys deposited by his agent in the agent's personal account, and thereafter used in payment to the bank of a pre-existing debt of the agent.

In the early case of Bank of Metropolis v. New England Bank, 1 How. 234, 11 L. Ed. 115, s. c. 6 How. 212, 12 L. Ed. 409, the facts were these: Certain negotiable paper, payable by parties in the District of Columbia, was held by the New England Bank in Boston. That bank indorsed the paper, without consideration, to the Commonwealth Bank in Boston for collection. The Commonwealth Bank sent the paper to the Bank of Metropolis in the District of Columbia. There had been mutual dealings between the Commonwealth Bank and the Bank of Metropolis, and an account current between them, in which they mutually credited each other with the proceeds of paper remitted for collection. On the face of the paper transmitted, the remitting bank appeared to be the owner. The balance sometimes was in favor of one bank; sometimes in favor of the other. Finally the Commonwealth Bank failed, and at that time it was debtor to the Bank of Metropolis. The question involved was whether the Bank of Metropolis could retain the proceeds of the notes belonging to the New England Bank to cover the balance owed by the Commonwealth Bank. The Bank of Metropolis had no notice or knowledge that the notes were not owned by the Commonwealth Bank. The trial in the lower court resulted in favor of plaintiff, New England Bank. Judgment was reversed in the Supreme Court for failure to give a certain requested instruction. In the course of its opinion the court said (1 How. 239, 240):

"There does not, indeed, appear to have been any express agreement that those balances should not be immediately drawn for; but it may be implied from the manner in which the business was conducted; and if the accounts show that it was their practice and understanding to allow them to stand and await the collection of the paper remitted, the rights of the parties are the same as if there had been a positive and express agreement; and *such mutual indulgence on these balances would be a valid consideration;* and, like the actual advance of money, give the plaintiff in error a right to retain the amount due on closing the account. * * * If, therefore, the jury find that the course of dealing between the Commonwealth Bank and the Bank of the Metropolis was such as is stated in the testimony; that they always appeared to be, and treated each other as the true owners of the paper mutually remitted, and had no notice to the contrary; and that balances were from time to time suffered to remain in the hands of each other to be met by the proceeds of negotiable paper deposited or expected to be transmitted in the usual course of the dealing between them, then the plaintiff in error is entitled to retain for the amount due on the settlement of the account." (Italics ours.)

The case was tried a second time, and again came before the Supreme Court. At this time the Supreme Court for the guidance of the trial court laid down three instructions or rules as follows (6 How. 227):

"1. If, upon the whole evidence before them, the jury should find that the Bank of the Metropolis, at the time of the mutual dealings between them, had notice that the Commonwealth Bank had no interest in the bills and notes in question, and that it transmitted them for collection merely as agent, then the Bank of the Metropolis was not entitled to retain against the New England Bank for the general balance of the account with the Commonwealth Bank.

"2. And if the Bank of the Metropolis had not notice that the Commonwealth Bank was merely an agent, but regarded and treated it as the owner of the paper transmitted, yet the Bank of the Metropolis is not entitled to retain against the real owners, unless credit was given to the Commonwealth Bank, or balances suffered to remain in its hands to be met by the negotiable paper transmitted, or

expected to be transmitted, in the usual course of the dealings between the two banks.

"3. But if the jury found that, in the dealings mentioned in the testimony, the Bank of the Metropolis regarded and treated the Commonwealth Bank as the owner of the negotiable paper which it transmitted for collection, and had no notice to the contrary, and upon the credit of such remittances made or anticipated in the usual course of dealings between them balances were from time to time suffered to remain in the hands of the Commonwealth Bank, to be met by the proceeds of such negotiable paper, then the plaintiff in error is entitled to retain against the defendant in error for the balance of account due from the Commonwealth Bank."

In Wilson v. Smith, 3 How. 763, 11 L. Ed. 820, the court reiterated the second rule and stated, obiter, that inasmuch as defendant had extended no new credit, and made no advances on the paper which he had received from plaintiff's agent, defendant, though he had no notice of plaintiff's rights in the paper, could not retain the proceeds of the paper as an offset to a debt owed by the agent to defendant. These cases have been followed in a number of instances. See Fulton National Bank v. Hosier (C. C. A.) 295 F. 611; Commercial Credit Co. v. Continental Trust Co. (C. C. A.) 295 F. 615; In re Steele-Smith Co. (D. C.) 298 F. 812, 815, 816; Bank v. Inglis (C. C. A.) 6 F.(2d) 841. See, also, Bank v. Bank (Tex. Civ. App.) 252 S. W. 1089.

On the other hand, numerous authorities hold, where an agent has deposited in a bank to his own personal account moneys in which a third party has a beneficial interest, and the bank, having no knowledge of the character of the deposit and no knowledge of facts sufficient to put it upon inquiry, has applied the moneys in payment of a pre-existing debt of the agent to the bank, that the beneficial owner cannot recover from the bank; and this, too, whether or not the bank has changed its position by reason of the deposit. A fortiori, would this be the case where the agent paid the bank by check on the deposit. 7 C. J. pp. 658, 659; Pomeroy's Eq. Jur. § 1048; Thomson v. Clydesdale Bank [1893] A. C. (House of Lords) 282; In re Goll (D. C.) 8 F.(2d) 101; Arnold v. San Ramon Valley Bank, 184 Cal. 632, 194 P. 1012, 13 A. L. R. 320, and note; Cable v. Iowa State Sav. Bank, 197 Iowa, 393, 194 N. W. 957, 197 N. W. 434, 31 A. L. R. 748, and note; Kimmel v. Bean, 68 Kan. 598, 75 P. 1118, 64 L. R. A. 785, 104 Am. St. Rep. 415; Titcomb v. Richter, 89 Conn. 226, 93 A. 526; Smith v. Des Moines Nat. Bank, 107 Iowa, 620, 78 N. W. 238;

Burnham v. Holt, 14 N. H. 367; Stephens v. Board, 79 N. Y. 183, 35 Am. Rep. 511; Hatch v. Bank, 147 N. Y. 184, 41 N. E. 403; Meyers v. N. Y. Bank, 36 App. Div. 482, 55 N. Y. S. 504. See, also, Holly v. Missionary Society, 180 U. S. 284, 21 S. Ct. 395, 45 L. Ed. 531.

It has been suggested that the cases of Bank of Metropolis v. New England Bank, supra, and Wilson v. Smith, supra, have been overruled by the later cases of Central National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693; Union Stockyards Bank v. Gillespie, 137 U. S. 411, 11 S. Ct. 118, 34 L. Ed. 724; United States v. Butterworth-Judson Corp., 267 U. S. 387, 45 S. Ct. 338, 69 L. Ed. 672; but a careful reading of these cases shows that each of them was decided on the ground of actual knowledge by the bank of the character of the deposit or knowledge of facts sufficient to put it on inquiry as to such character. The first rule therefore applied.

We do not find it necessary to attempt to harmonize these seemingly conflicting authorities. Under the facts and circumstances of the case at bar as above outlined, we think the accounts between Gottlieb and the bank show a "mutual indulgence of balances," in which the deposit of the proceeds of the cattle mortgaged to plaintiff played no inconsiderable part. In other words, we think it must be held that the bank did extend credit to Gottlieb by reason of the said deposits along with others, and did change its position by reason of the said deposits. The testimony and exhibits relative to the loans by the bank to Gottlieb, relative to the unrestricted checking out by Gottlieb of all his deposits, and relative to the allowance by the bank of the numerous overdrafts by Gottlieb, and the analysis above made of the accounts between Gottlieb and the bank, are all of them, when taken together, persuasive to that effect.

[5] Though the master did not specifically find this extension of credit and change of position on the part of the bank, yet he did find the primary facts from which such ultimate facts can and must be drawn. The case, therefore, comes within the third rule laid down in Bank of Metropolis v. New England Bank, supra, assuming, but without deciding, that that rule is still controlling in the federal courts. It follows that the plaintiff loan company cannot recover.

No attorney's fee will be taxed in either appeal, but the bank will recover its costs, other than the statutory attorney's fee, in its own appeal.

The decree must be reversed, with instructions to enter a decree in favor of the defendant bank. It is so ordered.