## In re BRAINARD HOTEL CO.

### FINEBERG v. STONE.
### No. 126.

Circuit Court of Appeals, Second Circuit.
Jan. 14, 1935.

McGowan & Stolz, of Syracuse, N. Y. (Max L. Stolz, Benjamin Stolz, and Carl Shapiro, all of Syracuse, N. Y., of counsel), for appellant.

Levy, Shulman & Murray, of Syracuse, N. Y. (Ralph Shulman, Carl C. Alpern, and Mayer Koplovitz, all of Syracuse, N. Y., of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from an order in bankruptcy which allowed a claim in reclamation against the trustee. Fineberg, the petitioner, kept a large sum in cash in one of a set of safes maintained for its guests by the bankrupt, a hotel where he lived. Access to each safe could be had only by the guest's key used in conjunction with a master key, kept in the "cage" of the cashier, Taggerty. There was a set of duplicate guest keys, one for each safe, kept in a safe in the office of the assistant treasurer, Morse. For some time, a year at least, Taggerty had been pilfering from the hotel. He had a till in which he was allowed to keep $1,500 which he used to cash cheques and make change; so far as we can find, he had no authority to make disbursements from it. He did have authority to receive payment from guests of their bills, which it was his duty and practice to remit daily to Morse, so that his own till would always hold $1,500 and no more. Morse had a till of his own whose limit was $5,150; he received remittances from several other tills

besides Taggerty's and at times disbursed to them, though just how and when does not appear. Although he learned of Taggerty's thefts in April, 1931, when his remittances began not to cover his receipts, Morse allowed his own till to be thus progressively depleted, though it does not appear that he shared the loot. An examination of the hotel being due on July 1, 1931, he, however, did compel Taggerty to make good his shortages of $2,500, by funds which Taggerty told him he had borrowed, as perhaps he had. At once Taggerty began to dip into his own till again and not to remit what he should to Morse. So matters went along until February 3, 1932, when Taggerty had taken $6,400 in all; the whole contents of his own till, and $4,900 from Morse. Either because Morse anticipated the bankruptcy which followed, or because otherwise alarmed, he told Taggerty on the 3rd that he must refill both tills, Taggerty answered that he thought he could get that much money; that there were three or four people to whom he could go.

Taggerty did get the money in the following way: He came on duty at one o'clock on the morning of the 4th; whether that was his usual hour does not appear. At once he got Fineberg's duplicate key from the safe in Morse's office; whether Morse was then there does not appear, though he was there a little later. We do not know what was the position of the safe, or whether in taking the duplicate key Taggerty would attract Morse's attention; whether he frequently went to the safe; or whether his visit was for any reason out of the routine or suspicious. Armed with the duplicate key, Taggerty took the master key from his own cage and by means of the two robbed Fineberg's safe of $6,400. Of this he put $1,500 in his own till, and gave $4,900 to Morse, some time between one and two o'clock. Morse did not actually know where Taggerty got the money; so much must be conceded and perhaps is. The issue is whether he should have suspected that it was improperly procured, and should have pressed his suspicions by inquiry. A petition in bankruptcy was filed against the hotel on the 4th and a receiver put in possession, who retained both Morse and Taggerty in his employ until the 9th when Fineberg discovered the theft. Between the 4th and the 9th both the tills remained full, the only transactions being to substitute cheques for cash, to make change, and to receive the payment of bills. Thus, so far as Fineberg retained any interest in the money after it got into the tills, a constructive trust attached to their whole contents in the hands of the trustee and he may recover as a preferred claimant. This feature of the case is so well established that we shall assume it without further discussion; the same doctrine applies to $900 which Morse deposited at once in a bank out of what Taggerty gave him. The referee and the judge held that the hotel was not a bona fide purchaser for value and gave a decree for the whole sum against the trustee, who appealed.

That the hotel was a purchaser for value there can be no doubt. State Nat. Bank v. United States, 114 U. S. 401, 5 S. Ct. 888, 29 L. Ed. 149; Holly v. Missionary Society, 180 U. S. 284, 21 S. Ct. 395, 45 L. Ed. 531; Stephens v. Board of Education, 79 N. Y. 183, 35 Am. Rep. 511; Hatch v. National Bank, 147 N. Y. 184, 41 N. E. 403. It received the money in discharge of a debt from Taggerty, which was good consideration. The only question is whether it was also a bona fide purchaser. As to the $1,500 which Taggerty put in his own till, it was not. In depositing the money he acted as the hotel's agent, and the hotel had notice of the theft because he knew it himself. The trustee answers that while this would be true if Taggerty had not had an interest adverse to the hotel, the doctrine does not apply because he had such an interest. It is true that an agent is as little likely to tell his principal that he is putting back money embezzled from him with money stolen from another, as he is to tell him anything relevant to frauds which he is at the moment actually committing upon the principal. But the current rationalization of the imputation of the agent's knowledge is the plainest kind of fiction anyway, and would not stand for a moment to-day, were it not for the illustrious names behind it; it has nothing to commend it in theory and has been a good deal limited in application. Be that as it may, it is settled that the principal is not a bona fide purchaser, when his agent makes restitution with money or negotiable securities wrongfully taken from another. That is as far as we need go here. Ditty v. Dominion Nat. Bank, 75 F. 769 (C. C. A. 6); Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, 9 Am. St. Rep. 698; Town of Fairfield v. Southport National Bank, 80 Conn. 92, 67 A. 471; Morris v. Georgia Loan, etc., Co., 109 Ga. 12, 34 S. E. 378, 46 L. R. A. 506; Rockey River Development Co. v. German American Brewing Co., 193 App. Div. 197, 184 N. Y. S. 155; Restatement of Agency § 274, Comment d, § 282 (2) (c), and Comment f.

Recovery of the money paid to Morse depends upon whether he had notice, not of Taggerty's theft from the hotel, but from Fineberg. Were the circumstances such as to put him on inquiry as to the source of the money? It must be owned that a strong argument can be made for the affirmative. Taggerty was known to Morse as a thief, an incorrigible thief, who having been once compelled to make restitution, immediately began to steal again; he was moreover presumptively a person of no resources, being only a cashier on a salary. Was it likely that he could borrow so much money; was it not probable that he might steal it? It is idle to discuss where the line should be drawn between suspicion and notice; the standard must confessedly be set ad hoc in each case, like so many other standards in the law. We can do no more than catalogue the circumstances which lead us in this case to think that there was not enough to awaken more than suspicion. Taggerty had once before borrowed a substantial sum when hard driven; true it was less than half what he was called upon to raise this time, but apparently he had friends who would support him at a pinch, and he could scarcely be pinched harder than he was then. He had said that he thought he could again manage even so large a sum; that there were three or four persons who would help him out; his hopes had apparently been realized. A hotel cashier makes many acquaintances some of whom might come to his relief in great extremity.

Fineberg suggests that Morse should have suspected that Taggerty might rob a guest's safe just as he did; that one who was willing to embezzle so shamelessly would not hesitate to rob. In the first place we are not told whether it was a habit of guests known to Morse to keep large sums of cash in these safes. Without explanation it seems to us to have been extraordinary that Fineberg had any such sum there; it must have been an exceptional occasion, we should suppose. But even though it was known to Morse that guests did keep cash in their safes, was he to suspect that Taggerty would know which one to choose? Again, he might, but it was a most unlikely chance that any one would tell him. And if Taggerty did learn of a cache from some confiding guest, to enter and steal is commonly regarded as a crime of considerably greater turpitude than to embezzle; dollar for dollar perhaps it is. A man might well stick at that, who was a persistent embezzler of small amounts.

Had Morse been privy to the taking of the duplicate key it would have been very different; but on this record he was not. We attach no importance to the money's being paid in the early hours of the morning; so far as appears that may have been Taggerty's regular hour for duty; and Morse's too. The record is silent upon this as upon much else which might clear up the issue; and the claimant has the burden of proof. On the whole it appears to us that he has not shown enough to hold the trustee for this part of the money; but in view of the unsatisfactory character of the record, he may have another hearing at which perhaps more will appear.

■ It is not necessary to say more about the position of the trustee that the New York General Business Law, § 200, bars the claim, than that the section was not intended to allow a hotel to keep the stolen property of its guests above $500. Millhiser v. Beau Site Co., 251 N. Y. 290, 295, 167 N. E. 447, semble.

Order affirmed as to $1,500; reversed as to the $4,900; and new hearing ordered; petitioner to have a general claim in addition of $500, so far as he does not recover in full. No costs.