TATEL, Circuit Judge,
dissenting.
Congress passed the Organized Crime Control Act of 1970, which included RICO, “to seek the eradication of organized crime in the United States ... by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.” United States v. Turkette, 452 U.S. 576, 589, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (quoting Pub.L: No. 91-452, 84 Stat. 922, 923 (1970)). Through this lawsuit, the United States seeks to end what it perceives as *1208 rampant racketeering violations within the tobacco industry. Specifically, the government offers voluminous evidence, which we must view in the light most favorable to it, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that at summary judgment the “evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor”), that Philip Morris, Altria Group, R.J. Reynolds, Brown & Williamson, Lorillard, BATCo, and Liggett have engaged in a half century of deceptive practices to the detriment of the health — and lives — of their customers. Acting both individually and in concert through collective agreements and jointly funded organizations like the Council for Tobacco Research and the Tobacco Institute (also defendants), these companies publicly defended smoking as both harmless and nonaddictive despite knowing from internal research that it was neither. In their advertising campaigns the companies targeted young people, who “often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,” Bellotti v. Baird, 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), despite publicly claiming otherwise.
The government alleges that during the course of this behavior, the defendants committed over ninety racketeering violations between RICO’s 1970 effective date and the government’s 1999 complaint. Significantly for this appeal, the government further claims that absent court intervention and despite the master settlement agreement between the tobacco companies and the states, the companies are likely to continue their deceptive practices and commit further racketeering violations in the future. The government’s claim regarding likely future conduct rests not only on the companies’ alleged history of deceptive activities, but also on record evidence that the companies continue making their misleading statements about both the health consequences of smoking and the addictive nature of nicotine, as well as persisting in their marketing efforts aimed at young people. The government asks the district court to enjoin the tobacco companies from future unlawful conduct and to order them to disgorge the profits they have earned due to their racketeering violations since RICO’s effective date — profits the government estimates amount to $280 billion.
In now holding that district courts may never order disgorgement as a remedy for RICO violations, this court ignores controlling Supreme Court precedent, disregards Congress’s plain language, and creates a circuit split — all in deciding an issue not properly before us. Because the tobacco companies ask us to address an issue not fairly included in the certified order and not presented at that time to the district court, I would dismiss this interlocutory appeal. Were it appropriate to reach the merits, I would uphold the district court’s denial of summary judgment on either of two grounds. First, unless “a statute in so many words, or by a necessary and inescapable inference, restricts the court’s jurisdiction in equity,” district courts may grant any equitable relief. Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). Because under a fair application of Supreme Court precedent, see id. at 398-403, 66 S.Ct. 1086, no such inference can be drawn about RICO, I would conclude that the district court has authority to order disgorgement. Alternatively, even if RICO’s phrase “prevent and restrain violations,” 18 U.S.C. § 1964(a), limits the district court’s equitable jurisdiction, I would still uphold the denial of summary judgment because the government has presented evi *1209 dence that disgorgement will accomplish just that purpose in this case.
I.
Under 28 U.S.C. § 1292(b), if a district court “shall be of the opinion that [an] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation,” it may certify the order for interlocutory review, and the court of appeals “may thereupon, in its discretion, permit an appeal to be taken from such order.” Section 1292(b) establishes a “two-tiered arrangement.” Swint v. Chambers County Comm’n, 514 U.S. 35, 47, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). Congress “chose to confer on district courts first line discretion to allow interlocutory appeals,” id., and “even if the district judge certifies the order under § 1292(b), the appellant still has the burden of persuading the court of appeals that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment,” Coopers & Lybrand v. Livesay, 437 U.S. 463, 475, 98 S.Ct. 2454,'. 67 L.Ed.2d 351 (1978) (internal quotation marks and citation omitted). In accepting this interlocutory appeal, this court not only (at the least) pushes the bounds of its jurisdiction, but also exercises its discretion on behalf of defendants whose litigating tactics leave much to be desired.
A.
In 2000, the tobacco eompanie,s^-usually referred to in this opinion as “Philip Morris”- — -filed a motion to dismiss, arguing (among other things) that “disgorgemépt ... is never available under a civil RICO count.” See United States v. Philip Morris Inc., 116 F.Supp.2d 131, 150 (D.D.C. 2000). Denying that motion, the district court held that' disgorgement could be available under 18 U.S.C. § 1964(a), but did not ‘ address whether disgorgement would be available in this particular case. See id. at 150-52. Philip Morris never sought certification of that order, though it could have done so at any time after the order’s issuance. See Fed. R. App. P. 5(a)(3) (providing that the time for filing an appeal runs from when the district court amends the order to include certification, not from the issuance of the actual order); 16 Wright, Miller & Cooper, Federal Practice and Procedure § 3929 (2d. ed.1996) (“This latitude [in Rule 5(a) ] makes it possible to employ § 1292(b) with some precision, deferring the question of appeal until it.is clear that prompt appeal is apt to be useful.”).
In 2004, Philip Morris sought summary judgment regarding the government’s request for disgorgement in this case. Contrary to the court’s statement, see majority op. at 1193, Philip Morris neither reargued the position it took in 2000 nor asked the district court to revisit its 2000 decision. Philip Morris’s only reference to its prior position came in a one-sentence footnote: “As noted previously, Defendants respectfully disagree with the Court and maintain that disgorgement in any fashion is unavailable to the Government in a civil RICO action.” Defs.’ Br. in Supp. Mot. Partial Summ. J. at 6 n.4. Instead, Philip Morris urged the court to grant its motion for summary judgment for two primary reasons. First, relying on United States v. Carson, where the Second Circuit held that district courts may order disgorgement as a RICO remedy only where the gains “are being used to fund or promote the illegal conduct,. or constitute capital available for that purpose,” id. at 20 (quoting United States v. Carson, 52 F.3d 1173, 1182 (2d Cir.1995)), Philip Morris claimed *1210 that 18 U.S.C. § 1964(a) “limits disgorgement to the amount of ill-gotten gains that remain available to defendants to fund future RICO violations,” id. Philip Morris further argued that “the Government deliberately has refused to develop the proof properly required under Carson ” and this in turn “requires dismissal of the Government’s disgorgement claim.” Id. at 25. Second, Philip Morris asserted that the government’s disgorgement model fails as a matter of law to reasonably approximate the defendants’ ill-gotten gains.
The district court rejected both arguments and denied summary judgment to Philip Morris. United States v. Philip Morris USA, Inc., 321 F.Supp.2d 72 (D.D.C.2004). Interpreting section 1964(a) more broadly than had the Second Circuit, the court concluded that it could order disgorgement in situations besides those identified in Carson. Id. at 77-79. Unsurprisingly, the district court did not revisit its 2000 decision, observing only (in a footnote) that this decision had held “that disgorgement is a permissible remedy under Section 1964(a).” Id. at 76 n. 7. The district court also rejected Philip Morris’s contention regarding the government’s disgorgement model. Id. at 81-82.
Philip Morris then asked the district court to certify its 2004 order under section 1292(b). In its certification request, Philip Morris did not reassert its legal argument from 2000. Instead, it stated that “[wjhether the Carson standard applies to the Government’s disgorgement claim is clearly a controlling question of law.... If the Government is wrong, and Carson applies, nothing is left of its claim in this case.” Defs Br. Supp. Mot. Certify Order # 550 for Interloc. App. at 4.
The district court agreed that a controlling question of law existed as to whether “the disgorgement allowed under 18 U.S.C. § 1964(a) is limited to those ill-gotten gains which are ‘being used to fund or promote the illegal conduct or constitute capital available for that purpose.’ ” United States v. Philip Morris USA, Inc., No. 99-2496, slip op. at 2-4, 2004 WL 1514215 (D.D.C. June 25, 2004) (quoting Carson, 52 F.3d at 1182). Although in its 2004 order the district court had rejected Carson’s interpretation of section 1964(a), it found substantial ground for difference of opinion on this issue, explaining that “it is obvious that the arguments to the contrary in Carson are neither insubstantial nor frivolous,” and certified the 2004 order. Id. at 4, 7.
In its initial petition urging this court to accept the interlocutory appeal, Philip Morris never raised the broader question the district court had addressed in 2000, i.e., whether disgorgement is ever available under section 1964(a). Instead, Philip Morris focused on the narrower issue actually raised in its 2004 motion for summary judgment, arguing that the district court had erred in rejecting Carson’s interpretation of section 1964(a) and claiming that “[i]f this Court agrees with the Second Circuit in Carson, its decision on appeal would dispose of the Government’s disgorgement claim.” Emergency Pet. for Permission to Appeal an Order at 9. The government opposed Philip Morris’s section 1292(b) petition, arguing that a host of factual issues would require resolution regardless of whether this court adopted Carson’s or the district court’s interpretation of section 1964(a) and thus that “interlocutory appeal would not materially advance the termination of this litigation.” Resp. in Opp’n to Emergency Pet. at 15.
Responding to the government’s opposition, Philip Morris suddenly changed tack and brought in play the issue decided in 2000. Philip Morris wrote:
The district court rejected [the government’s] argument [that an interlocutory *1211 appeal would not materially advance the litigation’s termination] as a reason not to permit an appeal, and this Court should as well.
First, and most obviously, if this Court reverses the district court’s ruling that ‘disgorgement is a permissible remedy under section 1964(a),’ (Summary Judgment Order at 8 n.7), then the Government’s $280 billion claim is precluded as a matter of law.
Reply to Emergency Pet. for Permission to Appeal an Order at 5. This entirely disingenuous statement conveyed the,impression that the district court had ruled on this broader issue in the certified'2004 order rather than’ simply mentioning its 2000 decision. Moreover, by placing this statement under the heading “The District Court Properly Determined That an Appeal From Its Order Would Materially Advance This Litigation,” id., Philip Morris insinuated that the district court had certified this issue to this court as opposed to the narrower question actually resolved in the 2004 order. The government, of course, had no opportunity to correct these' misrepresentations, and a motions panel accepted Philip Morris’s appeal, expressly leaving the merits panel free to reconsider and dismiss the appeal. In re Philip Morris USA, Inc., No. 04-8005 (D.C.Cir. July 15, 2004).
Philip Morris’s opening brief on the merits reveals the scope of its bait and' switch. The brief devotes forty -pages to the issue decided in the 2000 order and only seven to the issues' decided in the certified 2004 order. In response, the government urges us to dismiss th.e appeal entirely, suggesting that we lack jurisdiction over the issue decided in the 2000 order and observing that “Defendants’ tactics subvert the mechanism for appeal established by section 1292(b).” Appellee’s Br. at 45-46.
B.
As the foregoing discussion indicates, Philip Morris asks us — and the court now agrees — to decide an issue (1) not briefed in the motion leading up to the certified order, (2) not decided in the district court’s opinion accompanying the certified order, (3) not raised by Philip Morris in its request for certification, (4) not discussed in the order granting certification, (5) not raised by Philip Morris in its section 1292(b) petition before this court, and (6) decided in an entirely different order which Philip Morris could at any time have asked the district court to certify. This presents serious questions on.two separate fronts: our jurisdiction over this appeal under section 1292(b), and our general policy of declining to.consider arguments not made to the district court in the motion leading to the order.under appeal. Unlike the court, I cannot brush these concerns aside.
Regarding our jurisdiction under section 1292(b), the Supreme Court has made clear that an appellate court can review “any issue fairly included within the certified order” because “[a]s the text of § 1292(b) indicates, appellate jurisdiction applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court.” Yamaha Motor Corp., USA v. Calhoun, 516 U.S. 199, 205, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996) (holding that where the district court decided two issues in the certified order but identified only the damages issue as the controlling question of law, the court of appeals could nonetheless address the other issue). But the “court of appeals may not reach beyond the certified order to address other orders made in the case.” Id.; see also United States v. Stanley, 483 U.S. 669, 677, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (holding that the *1212 court of appeals erred in addressing a claim not raised in the certified order though closely related to it). Both “[c]om-mentators and courts have consistently observed that ‘the scope of the issues open to the court of appeals is closely limited to the order appealed from [and][t]he court of appeals will not consider matters that were ruled upon in other orders.’ ” Stanley, 483 U.S. at 677, 107 S.Ct. 3054 (quoting 16 Wright, Miller, Cooper & Gressman, Federal Practice and Procedure § 3929 (1977)) (second and third alterations in original).
This case falls near the intersection of these commands. For all intents and purposes, Philip Morris asks us to address the 2000 order. Today’s decision overturns that order. This court has jurisdiction to do this under Yamaha only if the issue addressed in the 2000 order is “fairly included within the certified order.” Taking a broad view of “fairly included,” the court concludes that because the 2004 order denies dismissal of the government’s disgorgement claim, we may review (at a minimum) any basis for summary judgment that is “logically interwoven with the explicitly identified issue.” See majority op. at 1196. This approach not only gives us jurisdiction over the issue decided by the district court in the 2000 order, but also over the district court’s 2002 determination, made in denying Philip Morris’s motion for a jury trial, that disgorgement is an equitable remedy rather than a legal one, United States v. Philip Morris, Inc., 273 F.Supp.2d 3, 8-11 (D.D.C.2002). Indeed, although the concurrence apparently does not share this approach, see sep. op. at 1206 (Williams, J., concurring), the majority opinion suggests that any issue which would result in “complete dismissal of the Government’s claim for disgorgement with prejudice” lies within our jurisdiction “regardless of the grounds the District Court gave for its decision,” see majority op. at 1194. By this logic, we may also have interlocutory jurisdiction to review the district court’s denial of the tobacco companies’ 2000 motion to dismiss, where they claimed that the government has not “adequately alleged that Defendants’ racketeering activity will continue into the future,” 116 F.Supp.2d at 147-50, and even the district court’s denial of Liggett’s 2000 motion to dismiss, where the company argued that (as to it) the government could not show two elements required for a RICO claim, id. at 152-53. Because victory for the tobacco companies on the first issue (and, for Liggett, victory on the second) could also trigger dismissal of the government’s disgorgement claims, under the court’s theory our interlocutory jurisdiction may extend to these issues as well.
The court’s approach is problematic in several respects. Most significantly, it curtails the district court’s section 1292(b) certification role. In this case, the district court had neither an opportunity to exercise “first line discretion to "allow interlocutory appeal[ ],” Swint, 514 U.S. at 47, 115 S.Ct. 1203, on the broader issue resolved in its 2000 order nor notice that Philip Morris would raise this issue with us. In future cases, district courts will lose them flexibility to certify discrete issues for review, since the certification of one order may give this court jurisdiction over all sorts of prior orders. Today’s situation illustrates this: under the court’s theory, we have jurisdiction in this interlocutory appeal to review at a minimum two prior orders, neither of which Philip Morris sought to certify. Moreover, by reducing the opportunity for tailored review, the court’s jurisdictional theory threatens this circuit with interlocutory overload. Parties who persuade us to accept an interlocutory appeal may feel encouraged to raise any or even all issues decided in prior *1213 orders that fall within our newfound jurisdiction especially since, according to the court, issues raised in prior orders are “preserved” for section 1292(b) purposes, see majority op. at 1196, and not simply for the purpose of appeal after final judgment.
By contrast, no harm of consequence would result from holding, as I would, that the only issues “fairly included” within a certified order are those decided in the district court’s accompanying memorandum — exactly the situation with the issue reached by the Supreme Court in Yamaha, 516 U.S. at 203-05, 116 S.Ct. 619. There, the Court found “fairly included” an issue that the district court had resolved in the same opinion in which it decided the issue identified as the controlling question of law, see Calhoun v. Yamaha Motor Corp., USA, No. 90-4295, 1993 WL 216238 (E.D.Pa. June 22, 1993). While the Court did not explicitly rely on this point, it is relevant to determining whether Yamaha’s “fairly included” language stands for the proposition that appellate courts have interlocutory jurisdiction over all possible bases for reversing a summary judgment denial (as my colleagues read it) or only over bases which the district court considered and resolved in this denial (as I read it).
My approach, moreover, respects the Court’s instruction in Stanley that we should “not consider matters that were ruled upon in other orders.” 483 U.S. at 677, 107 S.Ct. 3054 (citation omitted); of. Briggs v. Goodwin, 569 F.2d 10, 25 (D.C.Cir.1977) (noting that any possible justification for addressing “all other issues relevant to the result reached by [a certified] order” would “be substantially diminished ... where the order certified for appeal is a separate order from the one [containing the other issues]”); Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 840 (2d. Cir.1998) (finding that the certified order referred to rather than incorporated a prior order and concluding that no interlocutory jurisdiction existed over the issue decided in the prior order). It is thus hardly surprising that the court today points to no case in which an appellate court has exercised interlocutory jurisdiction over an issue decided in a different order -from the one under certification. True, under my approach a party seeking an interlocutory appeal on a matter split across two orders would need to seek certification of both orders to bring the matter fully to this court: But that seems a small burden. If the party fails to make this effort (as in this case) and we conclude that it would be inappropriate to address only the issues raised in the certified order (as I would here), then we have discretion under section 1292(b) to refuse to permit the interlocutory appeal altogether — a point this court-overlooks.
In addition to resting on a dubious interpretation of section 1292(b), the court’s decision to review the broader issue runs counter to this circuit’s general rules regarding waiver. Parties may raise here only .those arguments they presented to the district court in their papers seeking (and opposing) the order under review, since only in exceptional circumstances will we consider an argument not made to the district court. See United States v. British Am. Tobacco (Invs.) Ltd., 387 F.3d 884, 887-88 (D.C.Cir.2004) (finding waiver based on a party’s failure to appear and defend a privilege claim in the proceedings resulting in the interlocutory appeal, even though the party had asserted the privilege in a related proceeding in the same case); see also id. at 892 (refusing to consider argument not raised below) (citing United States v. Hylton, 294 F.3d 130, 135-36 (D.C.Cir.2002)). Here, as discussed earlier, Philip Morris never argued the broader issue in the relevant plead *1214 ings; a sentence-long footnote stating “respectful disagreement” is not an argument, particularly when offered in such a cursory fashion. Cf, e.g., Cement Kiln Recycling Coalition v. EPA, 255 F.3d 855, 869 (D.C.Cir.2001) (per curiam) (observing that a “litigant does not properly raise an issue by addressing it in a ‘cursory fashion’ with only ‘bare-bones arguments’ ”); Wash. Legal Clinic for the Homeless v. Barry, 107 F.3d 32, 39 (D.C.Cir.1997) (declining to address argument made in a footnote). Although it is true, as the court points out, that in the two just-cited cases the issues were apparently never raised at an earlier stage, here we are reviewing not the entire case but only the certified 2004 order, which sets the bounds of both our jurisdiction and waiver doctrine. Moreover, while we sometimes make exceptions to our waiver rules, I would not do so here given Philip Morris’s questionable tactics. Even under my colleagues’ jurisdictional theory, only by exercising our discretion to accept an argument not raised in the district court — -and further exercising our discretion to accept the interlocutory appeal— does the broader issue stand before us.
In sum, whether viewed in terms of jurisdiction or waiver, only Philip Morris’s narrower challenge is properly before us. True, this means we should dismiss the appeal altogether, as it makes little sense to decide the narrower question at this time when the broader question might be appealed later. But Philip Morris itself created this problem. It had several ways it could properly have brought the broader issue to our attention. In its 2004 motion for summary judgment, it could have rear-gued the broader question and asked the district court to reconsider its decision; the district court’s denial of reconsideration would have brought the issue fairly into the challenged order. Even more appropriately, Philip Morris could have asked the district court to certify both the 2000 and 2004 orders and candidly explained that it wished this court to review the earlier order as well. Either way, the district court, having fair notice that Philip Morris wanted to raise both issues with us, could have performed its section 1292(b) gatekeeping function. Taking neither approach, Philip Morris instead not only jumped the fence at the district court level, but also circumvented our own screening process by waiting until after the government’s opposition to raise the broader issue with the motions panel. This court should not be rewarding such tactics by exercising its discretion to hear this appeal. ¡
I would therefore dismiss the interlocutory appeal. I reach this conclusion reluctantly because I certainly understand how hearing this interlocutory appeal could be helpful to Judge Kessler, who is presiding over a long and difficult trial. In my view, however, preserving section 1292(b)’s integrity and discouraging the kind of litigating tactics reflected in this record far outweigh the efficiency that hearing this interlocutory appeal might produce in this concededly complex case.
But the court disagrees with my position. The appeal stands before us, so in the following sections I exercise a dissenter’s prerogative to address the merits. See, e.g., Gratz v. Bollinger, 539 U.S. 244, 291, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (Souter, J., dissenting); Arizona v. Evans, 514 U.S. 1, 18, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (Stevens, J., dissenting); Larson v. Valente, 456 U.S. 228, 258, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (White, J., dissenting).
n.
Like my colleagues, I begin with the structure and language of RICO’s remedial provisions. RICO authorizes criminal *1215 penalties and civil remedies against those engaging in patterns of racketeering behavior. 18 U.S.C. § 1963 sets out the criminal penalties: guilty persons shall “be fined under this title or imprisoned ... or both, and shall forfeit to the United States” any illegally -acquired interest. Section 1964 provides for the civil remedies. At issue in this case is subsection (a), which states:
The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.
Another subsection, § 1964(c), authorizes injured persons to sue RICO violators for treble damages and to recover attorneys’ fees. Finally, Congress directed that RICO “shall be liberally construed to effectuate its remedial purposes,” Pub.L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970) (codified, in a note following 18 U.S.C. § 1961) — a provision that, if it “is to be applied anywhere,, [should be applied] in § 1964, where RICO’s remedial purposes are most evident,” Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 491 n. 10, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).
The government argues that district courts have authority to order any remedy, including disgorgement, within their inherent equitable powers. More narrowly, the government argues that assuming -the district courts may only impose equitable remedies for the purpose of keeping defendants from committing RICO violations, disgorgement — by reducing the incentives for the tobacco companies to violate RICO in the future — will accomplish that purpose in this case. These two distinct arguments present very different- consequences for district courts: under the first theory, courts may order disgorgement any time they find the remedy necessary to ensure complete relief, while under the second theory courts may order disgorgement only to prevent ongoing or future violations. In this case, the district court accepted only the second argument. See 321 F.Supp.2d at 74-80. The court today rejects both. i -
A.
In dismissing the argument that district courts may impose any equitable remedy for RICO violations, the court distinguishes — unconvincingly, in my view — the two Supreme Court cases relied on by the government, Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), and Mitchell v. Robert De-Mario Jewelry, Inc., 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). I believe these two cases control this case and compel the conclusion that district courts may impose any equitable remedy for RICO violations.
In Porter, the Supreme Court considered whether a district court had authority to order restitution in a suit brought by the Price Control Administrator against a landlord-who had violated the Emergency Price Control Act (EPCA) by charging too much rent. The act contained no specific provision for restitution or disgorgement, but — like RICO — authorized a broad array of other remedies, both criminal and civil. On the criminal side, offenders could be fined and imprisoned. EPCA, § 205(b)-(c), 56 Stat. 23, 33 (1942). On the civil *1216 side, injured individuals could sue for treble damages plus attorneys’ fees, and if they were not entitled to sue or the statutory period for their suit had passed, the Administrator could sue for the same remedy on behalf of the United States. Id. § 205(e), 56 Stat. at 34, as amended by Stabilization Extension Act of 1944, § 108(b), 58 Stat. 632, 640-41. The Administrator could also sue to suspend a violator’s license. Id. § 205(f)(2), 56 Stat. at 35.
In the section most at issue in Porter, the act further provided that
[wjhenever in the judgment of the Administrator any person has engaged or is about to engage in [violations of the act], he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond.
Id. § 205(a), 56 Stat. at 33. Although this section clearly authorized injunctions aimed at future behavior, it made no express provision for restitution and did not, contrary to my colleagues’ suggestion, explicitly “grant[ ] general equitable jurisdiction” to the district courts, see majority op. at 1197. Indeed, in Porter, the Eighth Circuit had held that district courts were without authority to order restitution as a remedy for violations of the EPCA. Bowles v. Warner Holding Co., 151 F.2d 529, 532 (8th Cir.1945) (concluding that the district court had no authority to order restitution because “[i]t is well settled ‘That where a statute creates a right and provides a special remedy, that remedy is exclusive’ ”) (citations omitted).
The Supreme Court reversed. Discussing “the jurisdiction of the District Court to enjoin acts and practices made illegal by the Act and to enforce compliance with the Act,” 328 U.S. at 397-98, 66 S.Ct. 1086, the Court concluded' — -and I quote at length since the language is so critical to the disposition of this case — that
[sjuch a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.... [Tjhe court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice.
Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court’s jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.
Id. at 398, 66 S.Ct. 1086 (citations omitted). The Court concluded that because the EPCA, despite the very detailed and specific nature of the authorized remedies, did not rule out restitution by a “necessary and inescapable inference,” the district court could order restitution even if not expressly authorized by the statute. See id. at 398-400, 66 S.Ct. 1086; see also Mitchell, 361 U.S. at 291, 80 S.Ct. 332 (discussing Porter).
*1217 Indeed, the Court farther suggested that restitution could be considered an “other order” to enjoin or enforce compliance within section 205(a) in either of two ways. First, it could be “considered as an equitable adjunct to an injunction decree” since “where, as here, the equitable jurisdiction of the district court has properly been invoked for injunctive purposes, the court has the power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law.” 328 U.S. at 399, 66 S.Ct. 1086. Second, restitution could “be considered as an order appropriate and necessary to enforce compliance with the Act” since “future compliance may be more definitely assured if one is compelled to restore one’s illegal gains.” Id. at 400, 66 S.Ct. 1086. The Court then remanded for the district court to “exercise the discretion that belongs to it” and decide whether to order restitution. Id. at 403, 66 S.Ct. 1086.
Porter was not unanimous. “It is not excessive to say that perhaps no other legislation in our history has equaled the Price Control Acts in the wealth, detail, precision and completeness of its jurisdictional, procedural and remedial provisions,” id. at 404, 66 S.Ct. 1086, wrote Justice Rutledge in dissent. “The scheme of enforcement was highly integrated, with the parts precisely tooled and, minutely geared.” Id. “Congress could not have been ignorant of the remedy of restitution. It knew how to give remedies it wished to confer.” Id. at 405, 66 S.Ct. 1086. “[E]ven courts of equity may not grant relief in disregard of the remedies specifically defined by Congress.” Id. at 408, 66 S.Ct. 1086.
The court’s opinion today sounds a lot like the Porter dissent. The court observes that the language of section 1964(a) — a court has “jurisdiction to prevent and restrain-violations” — does not explicitly open the door to all of equity, but neither did EPCA section 205(a) (a court may issue orders “enjoining” violations or “enforcing compliance”). The court asserts that* reading full equitable. jurisdiction into RICO- will render section 1964(a)’s language largely meaningless, but Porter rejected just this concern with regard to EPCA section 205(a). The court emphasizes that RICO “already -provides for a comprehensive set of remedies,” majority op. at 1200, but the EPCA had at least as comprehensive a remedial structure. The court further points out that should restitution be available, the government could obtain duplicative = recovery (given RICO’s criminal forfeiture provisions) and also escape the applicable statutes of limitations, but the Porter majority dismissed similar concerns, 328 U.S. at 401-02, 66 S.Ct. 1086; see also id. at 406-08, 66 S.Ct. 1086 (Rutledge, J., dissenting). Finally, the court attempts to distinguish Porter on the grounds that the EPCA had a different policy goal than RICO (preventing inflation rather than seeking to eradicate organized crime), but this has no effect on Porter’s essential holding that “the court may go beyond the matters immediately underlying its equitable jurisdiction ... and give whatever other relief may be necessary under the circumstances,” see id. at 398, 66 S.Ct. 1086. In sum, the court offers no basis for concluding that RICO’s structure and language get the statute past Porter’s high bar for finding by a “necessary and inescapable inference” that Congress intended to empower district courts to order only limited equitable relief.
Nor does Philip Morris point to anything in RICO’s legislative history that creates such a “necessary and inescapable inference.” Only one remark even gives me pause. The Senate Committee report stated, “Subsection- [1964](a) contains *1218 broad remedial provisions for reform of corrupted organizations. Although certain remedies are set out, the list is not exhaustive, and the only limit on remedies is that they accomplish the aim set out of. removing the corrupting influence and make due provision for the rights of innocent persons.” S.Rep. No. 91-617, at 160 (1969); accord H. Rep. No. 91-1549, at 57 (1970). The second part of this “limit” — requiring due provision for the rights of innocent persons — poses no concern, for it describes equity rather than constricts it. See, e.g., Holly v. Domestic & Foreign Missionary Soc’y, 180 U.S. 284, 295, 21 S.Ct. 395, 45 L.Ed. 531 (1901) (“[A] court of equity will not transfer a loss that has already fallen upon one innocent party to another party equally innocent.”). But the first part of this “limit” — that remedies should accomplish the aim of removing the corrupting influence — does more than simply restate an equitable principle. Suggesting that the remedies must remove the corrupting influence, it allows one to infer that remedies may accomplish only this aim. But that inference is, to use Porter’s words, neither “necessary” nor “inescapable.” One could also infer that remedies must accomplish this aim as a lower limit (i.e., no corrupting influence may remain), but may also accomplish other aims — -just as remedies must make due provision for the rights of the innocent, but may presumably do much more. Indeed, this reading comports with how RICO’s sponsor, Senator McClellan, described the bill when he introduced it: the “ability of our chancery courts to formulate a remedy to fit the wrong is one of the greatest benefits of our system of justice. This ability is not hindered by the bill.” 115 Cong. Rec. 9567 (1969).
Mitchell, the second Supreme Court decision the government relies on, considered whether district courts could order restitution of wages lost from unlawful discharge in suits brought by the Secretary of Labor under section 17 of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 217 (1960). Relying on Porter, the Court concluded that where the statute provided that “the district courts are given jurisdiction ... for cause shown, to restrain violations” of the act, 29 U.S.C. § 217, district courts had full equitable powers, 361 U.S. at 291-95, 80 S.Ct. 332; see also id. at 289, 80 S.Ct. 332. Reaffirming Porter’s strong presumption in favor of finding equitable relief fully available, the Court stated: “When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of statutory purposes. As this Court long ago recognized, ‘there is inherent in the Courts of Equity a jurisdiction to ... give effect to the policy of the legislature.’ ” Id. at 291-92, 80 S.Ct. 332 (quoting Clark v. Smith, 38 U.S. (13 Pet.) 195, 203, 10 L.Ed. 123 (1839)) (omission in original); see also Califano v. Yamasaki, 442 U.S. 682, 704-06, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) (using the Porter presumption to conclude that district courts could order injunctive relief not explicitly authorized by the Social Security Act). The Mitchell Court thought it insignificant that because both the aggrieved employees and the Secretary could seek lost wages in actions at law under FLSA section 16, 29 U.S.C. § 216 (1960), duplicative recovery might occur. 361 U.S. at 292-93, 80 S.Ct. 332. But see id. at 303, 80 S.Ct. 332 (Whittaker, J., dissenting) (concluding that the statutory scheme “seems plainly to show that Congress intended by s 16(c) to allow recovery of unpaid minimum wages and overtime compensation at the instance of the Secretary only in an action at law, brought under that subsection, and triable by a jury”).
*1219 Mitchell reinforces the proposition that district courts may order- any equitable relief in civil RICO suits brought by the government. My colleagues suggest that in “the RICO Act, Congress provided a statute granting jurisdiction defined with the sort of limitations not present in the FLSA.” Majority op. at 1199. The only jurisdictional hook in the FLSA’s text, however, was its language: “the district courts are given jurisdiction ... for cause shown, to restrain violations” of the act, 29 U.S.C. § 217. If this language opens the door to all equitable relief, ..then RICO’s language — “[t]he district courts ... shall have jurisdiction to prevent and restrain violations” — certainly does the same. And if the possibility of duplicative recovery did not circumscribe the district court’s equitable authority under the FLSA, then neither should that possibility under RICO do so.
Not surprisingly, in the wake of Mitchell and Porter, circuit courts including this one have read general equitable jurisdiction into a variety of statutes that fail to provide explicitly for it. In SEC v. First City Financial Corp., 890 F.2d 1215 (D.C.Cir.1989), we held that district courts may order disgorgement under the Security Exchange Act’s sections 21(d) and (e), 15 U.S.C. § 78u(d)-(e) (1989), which provide that the district courts “shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding” compliance with the act and regulations made under it. See 890 F.2d at 1230 (relying on Porter and Mitchell). “Disgorgement, then, is available simply because the relevant provisions of the Securities Exchange Act of 1934, sections 21(d) and (e) ... vest jurisdiction in the federal courts.” Id.; see also SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir.1987); SEC v. Wash. County Util. Dist., 676 F.2d 218, 227 (6th Cir.1982). Other circuits have reasoned similarly in interpreting other acts. See, e.g., FTC v. Gem Merch. Corp., 87 F.3d 466, 468-70 (11th Cir.1996) (applying Porter in holding that courts may order restitution as a remedy for violations of the Federal Trade Commission Act); ICC v. B & T Transp. Co., 613 F.2d 1182, 1183-86 (1st Cir.1980) (applying Porter in holding that courts may order restitution as a remedy for violations of the Motor Carrier Act, though noting that “[i]f we were writing on a blank slate, we might agree with the district court that 'the language of the Motor Carrier Act cannot justify” the remedy of restitution); CFTC v. Hunt, 591 F.2d 1211, 1221-23 (7th Cir.1979) (applying Porter in holding that courts may order disgorgement as a remedy for violations of the Commodity Exchange Act).
Instead of following Porter and Mitchell, the court relies on a later Supreme Court decision, Meghrig v. KFC Western, Inc., 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). In Meghrig, the Supreme Court considered whether private citizens could seek restitution under the Resource Conservation and Recovery Act (RCRA) for the cost of having cleaned up a prior landowner’s toxic waste. The statute provided that the “district court shall have jurisdiction ... to restrain any person who has contributed or who is contributing” to waste problems, “to order such person to take such other action as may be necessary, or both.” Id. at 482 n. *, 116 S.Ct. 1251 (quoting 42 U.S.C. § 6972(a)). The Court held that it was “apparent from the two remedies described ... that RCRA’s citizen suit provision is not directed at providing compensation for past cleanup efforts.” Id. at 484, 116 S.Ct. 1251. While not explicitly defining the limits of the two remedies described, the court suggested that these remedies should be equated with prohibitory and mandatory injunctions. Id. Moreover, relying in part on the fact that an analogous statute expressly *1220 authorized damages, the Court concluded that “neither remedy ... contemplates the award of past cleanup costs, whether these are denominated ‘damages’ or ‘equitable restitution.’ ” Id. at 484-85, 116 S.Ct. 1251. According to the Court, it “is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.” Id. at 488, 116 S.Ct. 1251 (quoting Middlesex County Sewerage Auth. v. Nat’l Sea Clammers Ass’n, 453 U.S. 1, 14-15, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)).
The Meghrig Court noted that in arguing that the district court had inherent authority to award equitable remedies, the plaintiffs relied on Porter and its progeny. Id. at 487, 116 S.Ct. 1251. Without expressly distinguishing those cases, the Court explained that “the limited remedies described in [RCRA], along with the stark differences between the language of that section and the cost recovery provisions [of the analogous statute], amply demonstrate that Congress did not intend for a private citizen to be able to undertake a cleanup and then proceed to recover its costs under RCRA.” Id. Notably for our purposes, Meghrig did not overrule Porter. Indeed, even after Meghrig, the Supreme Court has cited Porter for the proposition that “we should not construe a statute to displace courts’ traditional equitable authority absent ... an ‘inescapable inference’ to the contrary.” Miller v. French, 530 U.S. 327, 340, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000); see also United States v. Oakland Cannabis Buyers’ Co-op., 532 U.S. 483, 496, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001).
At one level, reconciling Meghrig with Porter and Mitchell is difficult. Meghrig suggests that “to restrain” only authorizes prohibitory injunctions. By contrast, Mitchell holds that this language imposes no limit on the district court’s full equitable powers. Meghrig, relying on a version of the canon expressio unius est exclusio alterius, observes that courts should be “chary” in reading remedies into a statute which expressly provides for other remedies. By contrast, Porter indicates that in the context of equity jurisdiction, the general expressio unius canon gets inverted, meaning that district courts possess all equitable powers unless the statute “ines-capabl[y]” provides to the contrary. Cf. Renegotiation Bd. v. Bannercraft Clothing Co., 415 U.S. 1, 18-20, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974) (discussing these competing canons).
These tensions cannot be dealt with simply by dismissing Porter and Mitchell. Meghrig not only left both cases intact, but also suggested that the “limited remedies” in RCRA, together with the “stark differences” between RCRA and the analogous statute, explain the different outcomes. Given this, our responsibility is to follow the Supreme Court’s oft-cited instruction that “[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which dix-ectly controls, leaving to this Court the prerogative of overruling its own decisions.” Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); see also Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (reaffirming this requirement).
In my view, Porter and Mitchell, not Meghrig, “directly control” this case. Several reasons support this conclusion, and nothing points the other way. First, RICO’s statutory scheme resembles the EPCA more than the RCRA. Both RICO and the EPCA stand alone in grappling with a broad social issue, whereas the *1221 RCRA had a closely related statute on which the Court in Meghrig relied heavily. Second, as in both Porter and Mitchell, the government brought the suit rather than a private party like the Meghrig plaintiff, and Porter makes clear that district courts may have “even broader and more flexible” equitable powers where the public interest is involved, 328 U.S. at 398, 66 S.Ct. 1086. This point has particular traction if the government is the only party that may seek equitable relief under RICO. See Religious Tech. Ctr. v. Wollersheim, 796 F.2d 1076, 1083-89 (9th Cir.1986) (holding that equitable relief under RICO is available only to the government). But see Nat’l Org. for Women, Inc. v. Scheidler, 267 F.3d 687, 695-700 (7th Cir.2001) (holding that private plaintiffs can seek equitable relief under RICO), rev’d on other grounds, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003). Finally, Meghrig's suggestion that “restrain” in the RCRA refers only to prohibitory injunctions cannot apply to section 1964(a), since that section explicitly authorizes other remedies — e.g., divestment — to “prevent and restrain” RICO violations. For these reasons, in determining whether the phrase “prevent and restrain” limits the district court’s equitable powers, I think it makes more sense to look to Porter and Mitchell, not Meghrig.
The court “[r]ead[s] Porter in light of’ the statement in Kokkonen v. Guardian Life Insurance Co., 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), that “ ‘[fjederal courts are courts of limited jurisdiction’ ” and “ ‘possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.’ ” Majority op. at 1197. But “ ‘^jurisdiction,’ it has been observed, ‘is a word of many, too many, meanings.’ ” Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citation omitted). Kokkonen simply makes the unremarkable point that federal courts have subject-matter jurisdiction over cases only if the Constitution or Congress so provides, 511 U.S. at 377, 114 S.Ct. 1673, and the Supreme Court has since clarified that it is “unreasonable” to apply subject-matter jurisdiction principles where a statute uses the term jurisdiction “merely [in] specifying the remedial powers of the court,” Steel Co., 523 U.S. at 90, 118 S.Ct. 1003.
Finally, while Congress modeled section 1964(a) on the antitrust laws, see 115 Cong. Rec. 9567 (1969) (statement of Sen. McClellan); see also 15 U.S.C. § 4 (the “district courts ... are invested with jurisdiction to prevent and restrain violations”); accord 15 U.S.C. § 25, I disagree with Philip Morris that the Supreme Court’s antitrust decisions provide useful guidance as to, whether the phrase “prevent and restrain”, limits the equitable remedies available to district courts. On the one hand, the Court once ignored, though did not explicitly reject, an invitation by Justice Douglas to apply Porter to antitrust actions. See United States v. Nat’l Lead Co., 332 U.S. 319, 366-67, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947) (Douglas, J., dissenting in part); cf. United States v. Oregon State Med. Soc’y, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952) (emphasizing that in antitrust actions the purpose of injunctive relief is to “forestall future violations”);Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 639-47, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (declining to fashion and apply a common law right of contribution in the antitrust context). On the other hand, some antitrust cases suggest that courts may impose equitable remedies beyond those intended merely to stop future violations from occurring. E.g., United States v. Crescent Amusement Co., 323 U.S. 173, 189, 65 S.Ct. 254, 89 L.Ed. 160 (1944) (although *1222 the district court ordered a remedy said to “exceed any reasonable requirement for prevention of future violations,” the “Court has quite consistently recognized in this type of Sherman Act case that the government should not be confined to an injunction against further violations.... Those who violate the Act may not reap the benefits of their violations”); cf. United States v. U.S. Steel Corp., 251 U.S. 417, 452, 40 S.Ct. 293, 64 L.Ed. 343 (1920) (observing that the Sherman Act is “clear in its direction that the courts of the nation shall prevent and restrain [monopolies] (its language is ‘to prevent and restrain violations of the act); but the command is necessarily submissive to the conditions which may exist and the usual powers of a court of equity to adapt its remedies to those conditions”); Schine Chain Theatres v. United States, 334 U.S. 110, 128, 68 S.Ct. 947, 92 L.Ed. 1245 (1948) (suggesting that “[l]ike restitution,” divestment “merely deprives a defendant of the gains from his wrongful conduct” and upholding it as a remedy under the Sherman Act), overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 763 n. 8, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). As these cases illustrate, antitrust precedent offers little reason to doubt the applicability of Porter and Mitchell to the case at hand.
To sum up, Porter and Mitchell rather than Meghrig control this case, and no “necessary and inescapable inference” limits the district court’s jurisdiction in equity. If the district court concludes that the government has shown that the tobacco companies have committed RICO violations by advertising to youth despite assertions to the contrary and by falsely disputing smoking’s addictive, unhealthy effects, then it may order whatever equitable relief it deems appropriate. Of course, the court must work within the bounds of equitable doctrines, recognizing defenses like laches and unclean hands, paying due regard for the rights of the innocent, and generally exercising its discretion. With these principles in mind, the district court can “do complete rather than truncated justice,” Porter, 328 U.S. at 398, 66 S.Ct. 1086.
B.
In addition to rejecting the government’s argument that district courts may impose any equitable remedy on RICO violators, the court rejects the government’s alternative, narrower argument— that even if district courts may order only remedies that “prevent and restrain” RICO violations, disgorgement can appropriately accomplish that purpose. Because the court’s analysis of this argument is as flawed as its analysis of the government’s broader argument, I add this discussion of the issue. In my view, the court transforms what should be a question of fact— what remedies appropriately prevent and restrain future violations — into a question of statutory interpretation in a way that disregards section 1964(a)’s plain language and ignores Supreme Court precedent recognizing the equitable flexibility of district courts.
Under section 1964(a), district courts may issue “appropriate orders” to prevent and restrain” RICO violations. “Prevent” has many meanings. The first nonarchaic one listed in Webster’s Third New International Dictionary (1961) is “to deprive of power or hope of acting, operating, or succeeding in a purpose.” “Restrain” can mean “to hold (as a person) back from some action, procedure, or course: prevent from doing something (as by physical or moral , force or social pressure)” and “to limit or restrict to or in respect to a particular action or course: keep within bounds or under .control.” Webster’s Third New International Dictionary (1961).
*1223 The government offers expert testimony to the effect that a disgorgement order will deter the tobacco companies from violating RICO in the future — in the dictionary’s language, it will deprive them of the hope of succeeding in benefiting from future RICO violations and hold them back from committing such violations. In essence, the government claims that the tobacco companies, having engaged in a persistent pattern of deceptive representations over decades, will be less likely to continue this illegal behavior if they must surrender their past ill-gotten profits. Treating the government’s expert testimony as correct, as we must at this stage of the litigation, see Anderson, 477 U.S. at 255, 106 S.Ct. 2505, I think it enough to forestall summary judgment in Philip Morris’s favor. Indeed, the Supreme Court has accepted just this theory of deterrence, stating in Porter that restitution “could be considered as an order appropriate and necessary to enforce compliance with the Act” since “[fjuture compliance may be more definitely assured if one is compelled to restore one’s illegal gains.” 328 U.S. at 400, 66 S.Ct. 1086. If restitution helps enforce compliance, then we should have little doubt that disgorgement helps prevent and restrain violations.
This court does not conclude that disgorgement can never have a restraining effect on future conduct of the defendants — the only conclusion that could justify a holding that district courts can never order disgorgement under section 1964(a). Instead, the court offers several unpersuasive reasons for its conclusion that as a matter of statutory interpretation disgorgement is not a permissible remedy under section 1964(a).
First, the court states that disgorgement “is a quintessentially backward-looking remedy.” • Majority op. at 1198. Although I agree that a court sitting in equity cannot order disgorgement that exceeds a defendant’s past ill-gotten profits, see Tull v. United States, 481 U.S. 412, 424, 107 S.Ct. 1881, 95 L.Ed.2d 365 (1987) (observing that “[restitution is limited to ‘restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant’ ”) (quoting Porter, 328 U.S. at 402, 66 S.Ct. 1086), this does not mean disgorgement is always backward-looking and can' never have a forward-looking effect on the defendants. The Supreme Court made this clear in Porter, 328 U.S. at 400, 66 S.Ct. 1086, and Meghrig nowhere rejects Porter’s conclusion that a disgorgement order can impact future conduct — indeed, there was no evidence in Meghrig that the defendants were likely to commit future .RCRA violations, and in any event, as discussed supra at 1220-21, Porter and Mitchell are the cases most directly on point for our purposes.
Second, the court concludes that district courts are limited not merely by the words “prevent and restrain,” but also “by those [three remedies] explicitly included •in the statute” by application of the canons noscitwr a sociis and ejusdem generis. See majority op. at 1200; cf. United States v. Thomas, 361 F.3d 653, 659 (D.C.Cir.2004) (defining these canons). Even assuming we should apply these canons, however, they spell-out nothing more than what everyone agrees on: that the only “appropriate” orders under this section are equitable ones. See West v. Gibson, 527 U.S. 212, 225-26, 119 S.Ct. 1906, 144 L.Ed.2d 196 (1999) (Kennedy, J., dissenting) (observing that these canons “suggest the appropriate remedies authorized by [a statute using the word ‘including’] are remedies of the same nature as reinstatement, hiring, and backpay — ie., equitable remedies” and noting that “the phrase ‘appropriate remedies,’ furthermore, connotes the remedial discretion which is the hallmark of equity”).
*1224 More important, I doubt the canons apply here at all. While the canons can prove useful where there is otherwise “no general principle in sight,” Dong v. Smithsonian Inst., 125 F.3d 877, 880 (D.C.Cir.1997); see also Wash. State Dep’t of Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (applying the canons in interpreting the last listed term of “execution, levy, attachment, garnishment, or other legal process”), here the statute provides the general principle of preventing and restraining violations. Indéed, the Supreme Court declined to use these canons altogether in interpreting a statute which gave the EEOC the power of enforcement “through appropriate remedies, including reinstatement or hiring of employees with or without back pay,” 42 U.S.C. § 2000e-16(b). See West, 527 U.S. at 218, 119 S.Ct. 1906 (stating that the “word ‘including’ makes clear that ‘appropriate remedies’ are not limited to the examples that follow that word”); cf. Harrison v. PPG Indus., Inc., 446 U.S. 578, 588-89, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (declining to apply ejusdem generis canon where Congress used “expansive language”). I see no reason why we should do otherwise here, especially since section 1964(a) uses the even more expansive language: “including,- but not limited to.” Finally, noseitur a sociis and ejus-dem generis should not be used to limit the types of equitable relief available to district courts given Congress’s instruction that RICO “shall be liberally construed to effectuate its remedial purposes,” see supra at 1215, one of which is preventing and restraining future violations — an aim that, far from being a “hew purpose[ ] that Congress never intended,” see majority op. at 1201 (quoting Reves v. Ernst & Young, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)), expressly -appears in the statute’s text. If an -equitable remedy achieves this goal, then the statute authorizes it.
Third, the court suggests that disgorgement should be unavailable because it allows the government to achieve relief “similar in effect” to criminal forfeiture, raising concerns that the government can achieve duplicative recovery and evade the procedural safeguards girding the forfeiture provision. See majority op. at 1200-01. To be sure, such concerns are relevant in considering whether to infer additional causes of action. As discussed earlier, supra at 1217, however, given the Supreme Court’s explicit rejection of similar concerns in Porter and Mitchell, they cannot carry the day. Nor should such concerns stop a court from issuing equitable orders that accomplish the express statutory purpose of preventing and restraining RICO violations, whether the remedies'are specifically listed in section 1964(a), e.g., divestment, or available as other “appropriate orders.” Discussing RICO, the Supreme Court has observed that “Congress has provided civil remedies for use when the circumstances so warrant. It is untenable to argue that their existence limits the scope of the criminal provisions.” United States v. Turkette, 452 U.S. 576, 585, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The converse should hold as well. If an equitable remedy prevents and restrains RICO violations — one of the remedial purposes which we should liberally construe the statute to effectuate — it is untenable to claim that the existence of criminal provisions renders this remedy nonetheless beyond the scope of district court authority.
Of course, that disgorgement may sometimes serve to prevent and restrain defendants from committing RICO violations does not mean that it will always accomplish that purpose. As the district court here recognized, a court must first find *1225 that the defendants are likely to commit future RICO violations. 321 F.Supp.2d at 75-76. This is not a foregone conclusion. In Carson, for example, while the Second Circuit recognized that disgorgement can sometimes serve to prevent and restrain RICO violations, it was rightly skeptical that disgorgement of the “gains ill-gotten long ago by a retiree” who had long since left the union position that he had abused in accepting kickbacks would accomplish this purpose. 52 F.3d at 1182. Assuming district courts are limited to remedies that prevent and restrain, but see supra Part II.A, I also share the Second Circuit’s apparent conclusion that disgorgement may be ordered only to prevent and restrain a defendant from future RICO violations, see 52 F.3d at 1182. But see Richard v. Hoechst Celanese Chem. Group, 355 F.3d 345, 355 (5th Cir.2003) (leaving open the possibility that disgorgement might be ordered solely to deter other possible offenders). Because any remedy imposed for a solely exemplary purpose (i.e., to dissuade others from committing RICO violations) would amount to punishment, it goes beyond what Congress intended, see S.Rep. No. 91-617, at 81, as well as pushes the boundaries of what equity permits, cf. Tull, 481 U.S. at 422, 107 S.Ct. 1831. In this case, however, the government offers evidence that the defendant companies themselves are likely to commit future RICO violations by misleading the public about the health consequences of smoking and the addictive effects of nicotine, as well as by persisting in marketing to young people.
According to Philip Morris, only injunctions are “appropriate orders” under section 1964(a) because, in its view, they will always adequately prevent past lawbreakers from committing future violations, particularly given the threat of heavy contempt penalties. Refining this point, the concurrence finds it “almost inconceivable” that disgorgement can change the incentives governing a defendant’s future behavior given RICO’s other provisions. See , sep. op. .at 1204 (Williams, J., concurring). -The concurrence thus concludes that as a matter of law, Congress intended to ex- > elude disgorgement from those remedies appropriate to prevent and restrain RICO i violations. See id. at 1204-05. I think this approach is flawed in several respects.
To begin with,, as noted above, Porter ' indicated that disgorgement may encour- : age guilty defendants to obey the law in ’ the future. Interpreting a statute replete (like RICO) with other remedies, the ' Court concluded that “[f]uture compliance may be more definitely assured if one is ■.compelled to restore one’s illegal gains.” 328 U.S. at 400, 66 S.Ct. 1086. We are .without license to ignore the Supreme 'Court’s views on this point.
■ Moreover, Philip Morris’s suggestion "that only injunctions provide “appropriate” relief under section 1964(a) not only cuts against the statute’s plain language — Congress would hardly have included divestment in its list of sample remedies if it thought injunctions alone would be adequate — but also ignores the equitable flexibility the statute was designed to preserve, seé, e.g., 115 Cong. Rec. 9567 (1969) (statement of Sen. McClellan). Indeed, nothing in the statute requires courts to prefer contempt penalties (not explicitly named in section 1964(a)) to disgorgement (also not explicitly named). Rather, no single remedy is always appropriate. “The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.” Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329-30, 64 S.Ct. 587, 88 L.Ed. 754 (1944)). *1226 Sometimes injunctive relief alone will make the most sense; other times, different equitable remedies or combinations of equitable remedies, perhaps including disgorgement, might prove as or more effective.
To be sure, given RICO’s comprehensive remedial scheme, disgorgement orders may prove appropriate in preventing and restraining future violations only in rare circumstances. But “[i]n equity, as nowhere else, courts [should] eschew rigid absolutes,” Franks v. Bowman Transp. Co., 424 U.S. 747, 777 n. 39, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (internal quotation marks and citation omitted), and precisely what remedy or combination of remedies, within the bounds of the equitable doctrines discussed earlier, will serve to prevent and restrain defendants from committing RICO violations is an issue of fact, not statutory interpretation. For these determinations, we must rely in the first instance not on what we appellate judges can or cannot imagine will “prevent or restrain,” but on tried and true methods of fact-finding before district courts — including cross-examination and presentation of contrary evidence. Cf. id. at 780, 96 S.Ct. 1251 (noting district courts’ “‘keener appreciation’ of peculiar facts and circumstances”) (citation omitted).
Finally, and again as noted earlier, record evidence in this case suggests that disgorgement will in fact “prevent and restrain” defendants from committing future RICO violations. As one of the government’s experts stated, “[Requiring defendants to pay proceeds will affect their expectations ... about the returns from future misconduct.” Appellee’s App. at 813. The expert added that, even if coupled with an injunction laden with contempt penalties, disgorgement will “provide additional economic incentives to deter future misconduct” by “strengthen[ing] the credibility of existing laws” which the defendants have allegedly violated in the past. Id. at 814. Disagreeing, the concurrence offers its own “expert opinion” of the incentives driving the behavior of past RICO violators. See sep. op. at 1203-05, 1205-06. According to the concurrence, the most appropriate deterrence will stem from the “spotlight of the lawsuit,” if properly “amplif[ied]” by “transparency-enhancing and prior-approval measures.” Id. at 1205. Perhaps so, but “on summary judgment, the evidence should be viewed in favor of the nonmoving party, not,” as the concurrence would have it, “the other way around.” Langon v. Dep’t Health & Human Servs., 959 F.2d 1053, 1059 (D.C.Cir.1992) (reversing district court grant of summary judgment where that court disregarded admissible expert testimony); see also Sears, Roebuck & Co. v. Gen. Servs. Admin., 553 F.2d 1378, 1381-83 (D.C.Cir.1977) (holding that district court inappropriately granted summary judgment where experts disagreed about whether certain data constituted a “trade secret” from which an intelligent competitor could gain information). At this stage of the litigation, then, we must assume that the government expert is correct and that disgorgement will “prevent and restrain” future RICO violations. Should Philip Morris offer expert testimony along the lines suggested by the concurrence, then it will be up to the district court to evaluate the competing evidence and make appropriate findings of fact. Should either party appeal, this court, unrestrained by the inferences required at summary judgment, would then review that factual determination pursuant to Rule 52’s clear error standard. See Fed.R.Civ.P. 52 advisory committee’s note (observing that judgment under this standard “differs from a summary judg *1227 ment under Rule 56 in the nature of-the evaluation made by the court”); see also 9A Wright & Miller, Federal Practice and Procedure § 2585 (2d. ed.1994) (noting that under Rule 52 a reviewing court need not view the evidence in the light most favorable to the appellee).
C.
In sum, were this case properly before us, I would hold, in accordance with Porter and Mitchell, that district courts have authority to order any remedy, including disgorgement, necessary to ensure complete relief. As the concurrence points out, sep. op. at 1206 (Williams, J., concurring), my approach would create a circuit split, since Carson did not apply Porter and Mitchell to RICO (and, indeed, the parties do not appear to have brought these cases to the Second Circuit’s attention). Even if, as Carson holds, district courts may only impose equitable remedies for the purpose of keeping defendants from committing RICO violations, I would still affirm the denial of summary judgment, leaving it to the district court to determine, on the basis of a fully developed record, whether disgorgement will help accomplish this purpose. I disagree with my colleagues’ conclusions not because they have created a circuit split of their own by rejecting Carson’s holding that disgorgement may prevent and restrain RICO violations, but because they have done so by accepting an interlocutory appeal that we should not hear and by disregarding both Supreme Court precedent and section 1964(a)’s plain language.
III.
This leaves one final, distinct issue. Philip Morris claims that the government’s disgorgement model fails as a matter of law to measure the tobacco companies’ ill-gotten profits. Because the district court decided this issue in the certified order, it .is — unlike the issue the court does resolve — properly before us. See Yamaha, 516 U.S. at 205, 116 S.Ct. 619.
In calculating disgorgement, the government first identifies what it calls the “Youth Addicted Population” (YAP), namely, all people who were smoking an average of at least 5 cigarettes a day at the time they turned 21. The government next calculates that from RICO’s effective date in 1970 to 2001, the tobacco companies earned profits of $280 billion through sales to these people. The government arrives at this calculation by (1) determining the gross revenue from these total sales minus the direct costs (excluding overhead and taxes) and (2) adjusting for the time value of money. Philip Morris asserts that the government has failed to show that these profits are attributable to the companies’ alleged RICO violations, relying on admissions by government experts that it would be “highly unlikely” to say that “nobody under the age of 21 would have ever smoked regularly ... but for the defendants’ alleged RICO violations.”
Philip Morris cannot prevail on this issue at summary judgment because the government need not show that nobody under 21 would have smoked but for the RICO violations. As we held in First City Financial, 890 F.2d at 1229, “disgorgement need only be a reasonable approximation of profits causally connected to the violation.” In First City Financial, we found that the district court appropriately ordered disgorgement of all profits on a stock sale where the defendants failed to make a material disclosure, purchased stock whose value would likely have already risen had the disclosure been made, and then sold the stock for a killing after the undisclosed news broke. See id. at 1229-32. Although the government never *1228 proved that all increases in the stock’s value stemmed from the violation, we rejected the defendants’ argument that because the increase in price may have depended on other factors, disgorgement of all profits was “simplistic,.quite unrealistic, and so defacto punitive.” See id. at 1231. Noting that “[rjules for calculating, disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task,” we held that “the government’s showing of appellants’ actual profits on the tainted transactions at least presumptively satisfied” its “burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment.” Id. at 1231-32. Although recognizing that this might result in “actual profits becoming the typical disgorgement measure,” we observed that “the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.” Id. at 1232; see also SEC v. Banner Fund Int’l, 211 F.3d 602, 617 (D.C.Cir.2000).
Disentangling the tobacco companies’ legal and illegal profits might also be a “near-impossible task.” The government offers evidence that the tobacco companies not only fraudulently suggested that smoking was harmless and nonaddictive, but did so through a comprehensive, decades-long pattern of deliberate behavior. The government further offers evidence that advertising is a “very substantial influence on young people starting to smoke,” see Ap-pellee’s App. at 783, and that the tobacco companies committed RICO violations in advertising to young people while publicly denying that they were doing so. Under First City■ Financial, then, the government’s calculations serve as a reasonable approximation: just as we permit actual profits in insider trading cases to serve as a proxy for ill-gotten gains, so too can actual profits from sales to the YAP meet the government’s initial burden of reasonably approximating the tobacco companies’ unlawful gains. The burden would thus shift to Philip Morris to “demonstrate that the disgorgement figure was not a reasonable approximation,” 890 F.2d at 1232, and the district court would have to sort out who is right.